UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH EQUITY SERVICES, LLC d/b/a COMMONWEALTH FINANCIAL NETWORK and MARGARET BENISON, <br><br> Plaintiffs, <br><br> v. <br><br> THE OHIO NATIONAL LIFE INSURANCE COMPANY; OHIO NATIONAL LIFE ASSURANCE CORPORATION; and OHIO NATIONAL EQUITIES, INC., <br><br> Defendants. | Civil Action No. _____ |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Commonwealth Equity Services, LLC d/b/a Commonwealth Financial Network ("Commonwealth") and its registered representative Plaintiff Margaret Benison (collectively, "Plaintiffs") bring this action for injunctive relief and damages arising out of Defendants' unlawful scheme to: (a) obtain services from Plaintiffs without paying contractually agreed upon trail compensation; (b) withhold earned compensation as leverage to make Commonwealth sign a proposed new replacement agreement which provides substantially less compensation and which, unlike the contract presently in force, permits Defendants to unilaterally cancel all compensation at any time; and (c) interfere with Plaintiffs' relationship with those clients who own a variable annuity with a Guaranteed Minimum Income Benefit Rider ("GMIB Rider") by wrongfully attempting to cause the clients to surrender their variable annuity because it is in Defendants', but not the clients', best interest and is against Plaintiffs' interest, including that Defendants wish to stop paying trail commissions.

## INTRODUCTION

1.      In 1998, Defendants The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation and Ohio National Equities, Inc. (collectively "Ohio National" and/or "Defendants") and Commonwealth entered into a Selling Agreement (the "Selling Agreement") and an Addendum (the "Addendum"), pursuant to which, among other things, Commonwealth agreed to sell Ohio National's variable insurance contracts/policies ("Contracts") through Commonwealth's national system of registered representative brokers and/or registered investment advisors (individually and collectively "Representatives").  True and accurate copies of the Selling Agreement, the Schedule of Commissions ("Commission Schedule"), and the Addendum are attached hereto as Exhibits A, B and C.

2.      One of the Ohio National Contracts subject to the Selling Agreement was a variable annuity with a GMIB Rider ("GMIB Annuity").

3.      The GMIB Rider provides the client with the opportunity to take guaranteed retirement income for life, regardless of the performance or value of the underlying contract investments.

4.      The amount of the annual income is derived by taking the higher of a fixed percentage of either the investor's account value or the GMIB Rider income base.  The GMIB income base is calculated by compounding the client's investment by a fixed step up percentage every year until income distributions begin or the investor turns age 85.  For example, the majority of GMIB Riders sold by Ms. Benison had a fixed step up percentage of 6%.  Even if a combination of underperforming investments, contract fees and income distributions were to cause the annuity's account value to fall to zero, Ohio National is nonetheless still responsible for continuing a certain level of guaranteed income for the lifetime of the client.

2

5.      Upon information and belief, many of Ohio National's GMIB Riders, including those sold by Ms. Benison to her clients, are currently viewed as unprofitable for Ohio National due to various factors, including market factors.

6.      Consequently, Ohio National decided that it was in their best interest to get rid of existing GMIB Annuities, including those owned by Plaintiffs' clients.

7.      Initially, Ohio National sought to have the Representatives help Ohio National buy their way out of the situation.  As detailed below, Ohio National offered GMIB Annuity owners a "new" or alternative investment, and tried to incent Commonwealth's Representatives to "sell" clients on the benefit of the proposed exchange, indicating that the Representatives would get paid again for selling the alternative investment.  All but a small handful of Commonwealth's clients chose not to accept the swap, and only one of Ms. Benison's approximately twenty-five clients with a GMIB Annuity accepted the swap.

8.      Having failed to entice the clients (and their Representatives) with the "carrot," Ohio National next decided to try and stop the financial bleeding caused by the GMIB Annuities by using a "stick."  As described below, Ohio National devised a scheme to: (a) save money by refusing to pay owed trail compensation to Commonwealth on GMIB Annuities; and (b) drive a wedge between Plaintiffs and their clients in the hope of getting better results in future attempt(s) to coerce clients to surrender GMIB Annuities.

9.      Ohio National's scheme included several elements and is continuing.

10.      First, Ohio National announced the termination of the Selling Agreement, and informed Commonwealth that trail compensation would not be paid post termination, notwithstanding the terms of the Selling Agreement's Addendum which specifically provides that, after termination of the Selling Agreement, Ohio National must continue to pay

3

Commonwealth for as long as Commonwealth remains Broker Dealer of Record of an existing Contract.  True and accurate copies of the Ohio National's September 20, 2018 letter ("Termination Letter") and September 21, 2018 letter ("Servicing Agreement Letter") to Commonwealth are attached hereto as Exhibits D and E, respectively, and the proposed Servicing Agreement, which was enclosed with the September 21, 2018 letter, is attached as Exhibit F.

11.     Next, Ohio National sent Commonwealth an offer to sign a proposed new "Servicing Agreement" which, for all non-GMIB Annuity Contracts, provided for payment to Commonwealth of a "servicing fee" for servicing the non-GMIB Annuity Contracts, which fee is to be equal to the same compensation already owed by Ohio National to Commonwealth under the Selling Agreement.  See Exs. E and F.

12.     As noted, however, the Servicing Agreement does not provide for any compensation to be paid to Commonwealth regarding a GMIB Annuity.

13.     According to Ohio National, Plaintiffs are expected to service the GMIB Annuities, and incur the obligations that come with same, without payment or receipt of any compensation, including the compensation already owed to Commonwealth under the terms of the Selling Agreement.

14.     Servicing a GMIB Annuity is complicated.  A GMIB Rider affects, among other things:  the amount of withdrawals allowed per year on the Contract; the timing of withdrawals; the timing of annuitization; and the expected return per year from the annuity contract.  A true and accurate copy of the ONcore Flex Variable Annuity Prospectus dated May 1, 2018 with Supplements dated May 11, 2018 and September 7, 2018 ("Prospectus") which discusses the GMIB rider is attached hereto as Exhibit G.

4

15.     Deciding whether a GMIB Annuity should be surrendered or exchanged for another product is likewise complicated.  See Ex. G, at 47-54.

16.     Now, Defendants have decided to directly attempt to convince Plaintiffs' clients to give up their GMIB Rider benefits.

17.     In an email dated October 29, 2018, Ohio National notified Commonwealth and affected Representatives that:

> From **November 12, 2018 through February 11, 2019**, Ohio National is offering the opportunity for eligible clients to participate in a Buyout offer of their…variable annuity contract with Guaranteed Minimum Income (GMIB) rider.  By accepting this offer, clients will be cancelling their variable annuity contracts and all attached riders in exchange for an Enhanced Contract Value, which they may receive as a cash surrender or transfer to a financial product available from another financial institution.

("Buyout Offer").  A true and accurate copy of the October 29, 2018 Email to Margaret Benison is attached hereto as Exhibit Q ("October 29, 2018 Email").

18.     In that same Email, Ohio National made it clear that it was going directly to the client with the Buyout Offer:  "The following items accompany this letter:  A list of clients eligible for the offer[;] A sample of the letter your eligible client will receive[;] a copy of the GMIB Buyout Offer Acceptance form[.]"  Id.

19.     Ohio National's unlawful conduct is thus intended to extract extra-contractual promises from Plaintiffs and cut off the payment of trails commissions to Plaintiffs.  More troubling, that illicit effort seemed designed to: (a) pressure Plaintiffs to counsel their clients to surrender their GMIB Annuities or to purchase other financial products not in the clients' best interest; or (b) result in advisors providing less service to GMIB Annuity clients thereby increasing the chances Ohio National will get the result it seeks – surrender of the GMIB

Annuities, or (uninformed) transactions made by the clients that will void the terms of their

GMIB Riders.

> 20.     As articulated by the Investment News, Oct. 4, 2018 article titled, "How Ohio

National's Move May Lead to 'Unscrupulous' Broker Behavior with Annuities":

> > Even though most brokers will be losing trail commissions, Ohio
> > National executives believe they will continue providing services to
> > clients. . . . Advisers question that logic, saying brokers will
> > naturally shy away from helping annuity clients — or at least
> > providing the same level of service — if they're not compensated for
> > it.
> >
> > Some experts believe some of this broker behavior is precisely what
> > the insurer is trying to encourage — product exchanges and client
> > mistakes could allow the company to legally wriggle out of pricey
> > obligations it made to consumers.
> >
> > 'That is what Ohio National wants,' said Sheryl Moore, president
> > and CEO of consulting firm Moore Market Intelligence. 'Living
> > benefit guarantees are expensive, hard on their reserves and they
> > don't want it.'

> Greg Iacurci, "How Ohio National's Move May Lead to 'Unscrupulous' Broker Behavior with
>
> Annuities," Investment News, (Oct. 4, 2018).

> 21.     If Ohio National's scheme is not stopped, clients will be faced with evaluating

what is in their best interest without the benefit of the advice of a compensated advisor.

> 22.     Moreover, Ohio National's scheme places Commonwealth in a potential "Catch

22" situation.  If Commonwealth does not sign the Servicing Agreement, Ohio National has

indicated that, after the termination date of the Selling Agreement, it will not pay Commonwealth

any trail compensation on any Contracts.  On the other hand, if Commonwealth signs the

Servicing Agreement, Plaintiffs have concerns that Ohio National will argue that

Commonwealth's execution of the Servicing Agreement acts as some type of waiver or release of

its rights under the Selling Agreement.  Commonwealth attempted to obtain Ohio National's

position on this matter but Ohio National has not provided its position.

23.     Furthermore, Ohio National's scheme attempts to pressure Commonwealth into

signing the Servicing Agreement by pitting the interests of Representatives against each other.

Commonwealth's Representatives who have clients with non-GMIB Annuities have a potential

interest in Commonwealth signing the Servicing Agreement so they can get paid, and they may

feel that this interest outweighs the concern regarding waiving or releasing rights under the

Selling Agreement.  However, Commonwealth's Representatives who have clients with GMIB

Annuities have no such interest because they will not get paid under the terms of the Servicing

Agreement and, therefore, they may not want to risk potential waiver or release of any rights

under that Agreement.

24.     Thus, Plaintiffs seek injunctive relief to maintain the status quo while this legal

dispute is resolved in the Financial Industry Regulatory Authority ("FINRA") Arbitration

(including without limitation a permanent injunction arbitration hearing to be held within 15 days

of court ordered temporary relief) pursuant to the agreement to arbitrate contained in the

Addendum.  Ex. C.

25.     Plaintiffs also seek a declaratory judgment concerning the disputed rights and

obligations under the Selling Agreement and Servicing Agreement, as well as specific

performance and/or monetary remedies for: breach of contract; breach of the implied covenant of

good faith and fair dealing; fraud in the inducement; tortious interference; violations of Mass.

Gen. Laws ch. 93A, §§2 and 11; and unjust enrichment.

## PARTIES

26.     Plaintiff Commonwealth Equity Services, LLC d/b/a Commonwealth Financial Network is a Massachusetts Limited Liability Company with a principal place of business at 29 Sawyer Road, Waltham, Middlesex County, Massachusetts.  Commonwealth's only member is a single member Delaware LLC with a principal place of business in Massachusetts, whose only member is another Delaware LLC with a principal place of business in Massachusetts, whose only member is a corporation organized under the laws of Massachusetts with a principal place of business in Massachusetts.  Commonwealth is an independent broker dealer registered with the FINRA and is also an investment advisor firm registered with the United States Securities and Exchange Commission ("SEC").  Commonwealth Equity Services, LLC was converted from Commonwealth Equity Services, Inc. under the laws of Massachusetts on August 1, 2017, retaining all the powers, privileges, rights, duties, liabilities and limitations of Commonwealth Equity Services, Inc.  Commonwealth Equity Services, Inc. was converted from Commonwealth Equity Services, LLP under the laws of Massachusetts on November 23, 2010, retaining all the powers, privileges, rights, duties, liabilities and limitations of Commonwealth Equity Services, LLP.  Commonwealth Equity Services LLP was converted from Commonwealth Equity Services, Inc. under the laws of Massachusetts on December 22, 2004, retaining all the powers, privileges, rights, duties, liabilities and limitations of Commonwealth Equity Services, Inc.

27.     Plaintiff Margaret Benison is a citizen of Massachusetts and resides in Shrewsbury, Massachusetts.  Ms. Benison is a FINRA registered representative of Commonwealth and has been since 1998.  She is also an investment advisor representative of Commonwealth's SEC Registered Investment Advisor.

28.     Defendant The Ohio National Life Insurance Company is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati,

Ohio 45242.  The Ohio National Life Insurance Company is a wholly owned stock subsidiary of Ohio National Financial Services, Inc, which corporation has the same principal place of business.

29.    Defendant Ohio National Life Assurance Corporation is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242.  Ohio National Life Assurance Corporation is a wholly owned stock subsidiary of The Ohio National Life Insurance Company.

30.    Defendant Ohio National Equities, Inc. is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242.  Ohio National Equities, Inc. is an independent broker dealer registered with FINRA.  Upon information and belief, Ohio National Equities, Inc. is a wholly owned subsidiary of The Ohio National Life Insurance Company.

31.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. §1332.  The Ohio National defendants are corporations incorporated under the laws of Ohio with principal places of business in Ohio.  Plaintiff Ms. Benison is a citizen of Massachusetts.  Commonwealth is a limited liability company, with members who are citizens of Massachusetts and/or Delaware and which has a principal place of business in Massachusetts.  None of Commonwealth's members are citizens of Ohio.  The amount in controversy, without interest and costs, exceeds the sum or value of $75,000.

32.    This Court, pursuant to Massachusetts General Laws c. 223A, §3, has jurisdiction over Ohio National because, as detailed below, it engaged, directly or indirectly, in actions or conduct within Massachusetts, which actions and conduct were targeted at and caused injury to Massachusetts residents in Massachusetts.

33.     Additionally, Ohio National, as detailed below, conducted and solicited business in Massachusetts, engaged in a persistent course of conduct in Massachusetts and/or derived substantial revenues from goods or services used in Massachusetts, and engaged in conduct which caused foreseeable injuries to Plaintiffs, Massachusetts residents, in Massachusetts.

34.     Massachusetts is the focal point of the facts underlying this matter and of the harm suffered in this action.

35.     Ohio National purposefully and deliberately participated in wrongful conduct that inflicted predictable injury in Massachusetts to Plaintiffs.

36.     Ohio National knew that the brunt of the wrongful actions would be felt by Plaintiffs in Massachusetts, where Ms. Benison and Commonwealth are residents, and where Commonwealth maintains its headquarters and principal place of business.

37.     Ohio National is also subject to the jurisdiction of Massachusetts courts based on continuous and systematic activity within Massachusetts.

38.     Defendant Ohio National Equities, Inc. is registered with the Commonwealth of Massachusetts to engage in securities business in Massachusetts under the Massachusetts Uniform Securities Act.

39.     Defendants Ohio National Life Insurance Company and Ohio National Life Assurance Company have sought and obtained licenses to write insurance in the Commonwealth of Massachusetts, and each has over 200 appointed insurance agents located within Massachusetts.

40.     Ohio National solicits and advertises products to consumers and businesses in Massachusetts.

41.     Among other things, Ohio National's website (http://www.ohionational.com), which is available to businesses and consumers in Massachusetts, advertises that Ohio National's products are available nationwide, including in Massachusetts, and that Ohio National Life Insurance Company and Ohio National Life Assurance Company have obtained Massachusetts "certificates of authority."

42.     Ohio National's website (http://www.ohionational.com) also advertises that professional contracts, including career agent contracts, general agent contracts and producing agent contracts, are available to financial professionals within Massachusetts.

43.     Thus, Ohio National sells products to, and enters into contracts with, Massachusetts residents, including without limitation purposefully and knowingly selling a substantial number of Contracts to Massachusetts residents.

44.     Ohio National, by carrying out regular business transactions with Massachusetts businesses and consumers, purposefully availed themselves of the privilege of conducting activities within Massachusetts, thus invoking the benefits and protections of its laws.

45.     For these reasons, as well as the reasons detailed below, Ohio National has sufficiently entered into the business life of Massachusetts, so that they may not now avoid the consequences of suit here.

46.     Venue in this Court is proper pursuant to 28 U.S.C. §§1391(b)(1) and (c)(2), because Ohio National are entities with the capacity to be sued in their common name and are subject to this Court's personal jurisdiction with respect to this civil action.

47.     Venue in this Court is also proper pursuant to 28 U.S.C. §1391(b)(2) because, as detailed below, a substantial part of the events or omissions on which the claims are based occurred in Massachusetts, and the subject contract, the Selling Agreement and Addendum, were

executed here, and the termination of the Selling Agreement and the Servicing Agreement offer

were sent by Ohio National to Commonwealth in Massachusetts.

## REMAINING FACTUAL BACKGROUND

### Commonwealth Financial Network.

48.     Commonwealth offers investment and advisory products and services directly to

retail customers through agents and brokers who are licensed and registered with FINRA, with

the SEC and with state insurance agencies.

49.     Commonwealth supervises and processes the investment business of the financial

professionals who affiliate with it; *i.e.* its Representatives.

50.     Commonwealth affiliates with Representatives to market, promote and sell

financial products, and provides Representatives with the resources and facilities of a full-service

broker dealer and/or investment advisory firm, as well as ongoing professional and operational

training and support to assist them in performing their duties.

51.     Representatives affiliate with Commonwealth based upon the goodwill and

reputation of Commonwealth in the financial services industry, including in large part

Commonwealth's reputation for selecting high quality financial products and ensuring that

Representatives are compensated properly for selling and servicing those products.

52.     Commonwealth's customers are the clients of its Representatives.

53.     Some of the financial products selected by Commonwealth to be available to its

Representatives for sale and servicing are manufactured by third party companies, such as Ohio

National, with which Commonwealth enters into selling and/or servicing agreements.

54.     In those circumstances, Commonwealth's revenue and its Representatives'

compensation are based on the commissions received from third parties for the sale and/or

servicing of the third parties' financial products sold to customers by Commonwealth's Representatives.

55.     Commonwealth selects each financial product based on various factors; most notably, its compliance with securities laws, the financial soundness of the company offering the financial product, the suitability of the product for its customers, and the compensation that will be provided for selling the product.

### In 1998, Commonwealth Enters into the Selling Agreement with Ohio National.

56.     In 1998, Ohio National entered into the Selling Agreement with Commonwealth. A true and accurate copy of Ohio National's June 15, 1998 letter to Commonwealth is attached hereto as Exhibit H.  See also Exs. A-C.

57.     Under the Selling Agreement, Ohio National appointed Commonwealth to sell its Contracts: "ONL … hereby appoint[s] BD to supervise solicitations of the Contracts, and to facilitate solicitations of sales of the Contracts which are described in the Schedule(s) of Commissions attached hereto."  See Ex. A, ¶1.

58.     For a Representative to sell an Ohio National Contract, the Representative must be vetted and appointed as Ohio National's agent to solicit sales of the Contracts.  See Ex. A, at 1-2.

59.     As part of the Selling Agreement, Commonwealth specifically agreed that it:

> …shall have full responsibility for supervision of all Representatives associated with BD who are engaged directly or indirectly in the offer or sale of the Contracts and all such persons' activities in connection with the sale of the Contracts.

See Ex. A, ¶5.

60.     Commonwealth agreed also to ensure the completeness of all Contract applications, as well as the suitability of all sales.  See Ex. A, ¶7.

61.     Once a Contract is accepted and issued to a Commonwealth customer,

Commonwealth then transfers all premiums paid on the Contract to Ohio National.  See Ex. A,

¶8.

62.     Commonwealth agreed further to take steps to ensure that, once purchased, the

Contracts remained in force and were not replaced.  Specifically, Commonwealth expressly

agreed, "that neither it nor its Representatives will:

> … engage in any course of conduct to systematically replace
> Contracts issued by [Ohio National]; or recommend or cause the
> surrenders (sic) of cash values of the Contracts to purchase or
> exchange for insurance policies or annuities issued by other
> insurance companies, unless such action is in the best interests of
> the Contract Owner. This provision will continue in force after the
> termination of this Agreement.

See Ex. A, ¶23.

63.     For the sale of Contracts under the Selling Agreement, Ohio National agreed that:

> Commissions payable in connection with the contracts shall be paid
> to BD according to the Commission Schedule(s) relating to this
> Agreement as they may be amended from time to time and in effect
> at the time the Contract Payments are received by [Ohio National].

See Ex. A, ¶9.

64.     The Commission Schedule provided by Ohio National and incorporated into the

Selling Agreement addressed payment of commissions to Commonwealth and its

Representatives regarding three different Variable Annuity Contracts: ONcore Premier FPDA

("Premier"); ONcore Value FPDA ("Value"); and ONcore Flex FPDA ("Flex").[1]  See Ex. B.

---

[1] On information and belief, Ohio National published Commission Schedules for all of its Variable Annuity
Contracts.

65.     The Commission Schedule also identified three types of commissions that could be paid on a Contract: commissions on initial premiums; commissions on add-on premiums; and trail commissions.  See Ex. B.

66.     The Commission Schedule provided that, for some Contracts, Representatives could choose from commission pay out options.  See Ex. B, at 1.

67.     Specifically, the Commission Schedule allowed Commonwealth and its Representatives, on certain Contracts, to choose to be paid a greater amount upon the initial sale of the Contract, or to be paid more evenly (in the form of a trail commission) over the life of the Contract.  See Ex. B, at 1.

68.     All of the commission options for all of Ohio National's Variable Annuity Contracts under the Commission Schedule provided a trail commission for Commonwealth and its Representatives, except for Value Option 1.  See Ex. B, at 1-2.

69.     A trail commission is compensation based on both the premiums paid by the customer and the earnings on those premiums that is deferred by Commonwealth and the Representative for at least a year, and that lasts until the Contract is annuitized or surrendered. For example, if a Representative sells a Contract for a premium of one-hundred thousand dollars ($100,000), and agrees to a one percent trail commission starting in deposit year seven, then the Representative's trail compensation for that sale will be one-thousand dollars ($1,000) plus the earnings on that initial premium per year, but the Representative will only begin to be paid the trail compensation seven years from the sale of the Contract.   See Ex. B.

70.     The Commission Schedule also provided that, "[t]rail commissions will continue to be paid to the broker dealer of record while the Selling Agreement remains in force."  See Ex. B, at 2.

71.     From 1998 to the present, Ohio National weekly sends to Commonwealth in Massachusetts the following: (a) commission statement(s) identifying the commissions payable to Commonwealth for each Contract; and (b) payment for the total amount of commissions due.

### Addendum to the Selling Agreement

72.     As noted, the Commission Schedule provided that trail commissions would be paid to Commonwealth while the Selling Agreement remained in force; however, neither the Schedule, nor the Selling Agreement (Ex. A) addressed the payment of trail commissions when/if the Selling Agreement was terminated.  Exs. A and B, at 2.

73.     Consequently, during negotiations over the Selling Agreement, Commonwealth drafted, and Ohio National executed contemporaneously with the Selling Agreement, an Addendum to the Selling Agreement ("Addendum") to specifically address the payment of trail commissions when/if the Sales Agreement was terminated.  See Ex. C.

74.     Pursuant to the Addendum, Ohio National agreed that:

> **[A]t the termination of this contract all commissions** … payable to Commonwealth Equity Services, Inc. as provided by the Agreement **shall continue to be payable to Commonwealth Equity Services, Inc. for as long as they are listed as the Broker-Dealer of record**[.]

See Ex. C, at 1 (emphasis added).

75.     Consequently, even if the Selling Agreement was terminated, Commonwealth would still receive commissions for as long as it remained the Broker-Dealer of record.

76.     With respect to termination of the Selling Agreement, the parties agreed that:

> This Agreement may be terminated at the option of any party upon sixty (60) days written notice to the other parties, or without notice at the option of any party hereto upon a material breach by any party of the covenants and terms of this agreement.

See Ex. A, ¶20.

16

## Ohio National Benefits from Commonwealth's Business

77.     In 1998, Commonwealth commenced selling Ohio National Contracts through its Representatives to customers.

78.     Thus, Ohio National, through the Selling Agreement, gained access to Commonwealth's Representatives, clients and potential clients.

79.     Commonwealth's existing and prospective customers are the lifeblood of Commonwealth's business.

80.     Representatives, such as Ms. Benison, generate good will and a positive reputation with customers by providing sound financial advice free of conflicts of interest, by offering suitable financial products based upon each client's individual needs, and by effectively servicing each customer's investments.

81.     Commonwealth is currently servicing approximately seven hundred and ninety-eight (798) Ohio National Contracts that pay trail commissions, which, upon information and belief, provide millions of dollars in revenue for Ohio National annually.

## Ohio National's Variable Annuities with GMIB Riders

82.     Among the Contracts Ohio National issues are ONcore variable annuities ("Variable Annuities")[2], which are deemed securities under the Securities Act of 1933 ("1933 Act").

83.      As part of that offering, Ohio National provides information regarding the product via a prospectus filed with the SEC.

---

[2] On information and belief, Ohio National offers variable annuity products under the following names: ONcore Flex; ONcore Flex II; ONcore Lite; ONcore Lite II; ONcore Lite III; ONcore Premier; ONcore Premier II; ONcore Ultra; ONcore Ultra II; ONcore Value; ONcore Wrap; ONcore Xtra; and ONcore Xtra II.

84.     For example, the ONcore Flex Variable Annuity Prospectus contains information for customers concerning, among other things, the minimum initial payment required to purchase a contract, the treatment of the variable annuity under federal tax laws, and the payouts to the customer.  See Ex. G.

85.     An ONcore Variable Annuity issued by Ohio National is a security for which the customer pays a premium to purchase a Contract.  The premium is used to purchase shares in mutual funds held in Ohio National's Variable Account A ("VAA").

86.     Any money invested in the Contract grows tax deferred.  The initial premium, any additional premiums paid, and the market performance of the underlying investments, becomes the overall Contract value.

87.     When the Contract holder decides to annuitize the Variable Annuity, Ohio National must pay the Contract holder either the value of the Contract or lifetime annuity payments.  See Ex. G, at 1.

88.     At the time of the purchase, the customer can select among several riders that affect the way Contract-based funds will be dispersed by Ohio National.

89.     Among the types of riders offered are GMIB Riders which, as noted, provide the client with the opportunity to take a predictable and guaranteed retirement income for life, regardless of the performance or value of the underlying contract investments.

90.     In other words, if the amount due the customer pursuant to a GMIB Rider is greater than the "value of [the customer's] interest in the VAA," the difference is paid from Ohio National's general account.  See Ex. G, at 47.

**Ohio National Tries to Incent Representatives to
Advocate Surrender of Clients' GMIB Annuities.**

91.     Ohio National decided that it wanted to get out from under the unprofitable GMIB

Riders.

92.     In late 2017, Commonwealth received notice from Ohio National that, starting

January 2, 2018, Ohio National would offer to exchange a customer's Contract containing a

GMIB Rider for another Ohio National product without a GMIB Rider (the "Offer").  A true and

accurate copy of the notice ("Offer") is attached hereto as <u>Exhibit</u> I.

93.     In connection with the Offer, Ohio National stressed that Representatives would

benefit from a client's exchange of a Contract containing a GMIB Rider because the exchange

would count as a "new sale" for which the Representative would receive (another) commission.

See <u>Ex.</u> I, at 2.

94.     Ohio National also admitted that *it* could benefit from the exchange:

> Ohio National could gain a financial benefit, because, due to
> regulatory changes and a prolonged period of low interest rates,
> supporting the guarantees associated with the VA contracts and
> GMIB riders may be more expensive for us than the guarantees
> associated with the [new contracts].

See <u>Ex.</u> I, at 2.

95.     On December 1, 2017, Ohio National published the Offer as a supplement to its

May 2017 Prospectus.  A true and accurate copy of the December 1, 2017 supplement ("2017

Supplement") is attached hereto as <u>Exhibit</u> J.

96.     The 2017 Supplement cautioned clients that evaluating the financial implications

of the proposed exchange could be complicated and, therefore, it was recommended that clients

consult with their financial advisor before accepting the Offer:

> You should consult with your financial professional … to discuss
> factors relevant to your financial needs and retirement goals. We

> cannot give you any investment advice or recommend whether you
> should accept this Offer.

<u>See</u> <u>Ex.</u> J, at 3.

97.     The 2017 Supplement also alerted clients to the incentive being provided to

broker-dealers and their Representatives, as well as Ohio National's likely gain if the client

accepted the offer:

> [Ohio National] could gain a financial benefit from the Offer
> because … supporting the guarantees associated with the Eligible
> ONcore variable annuities and the Eligible GMIB riders may be
> more expensive for us than the guarantees associated with the
> ONdex fixed indexed annuities and the GLWB riders.
> 
> …
> 
> Your financial professional may receive compensation from his or
> her broker-dealer due to the exchange.  Such compensation may be
> higher or lower than the compensation they would receive if you did
> not accept the Offer and maintained your ONcore variable annuity,
> which may provide them an incentive in recommending whether or
> not you should accept the Offer.  Contact your financial professional
> for information about the compensation he or she receives.

<u>See</u> <u>Ex.</u> J, at 10.

98.     The Offer potentially affected two-hundred and thirty-two (232) Commonwealth

clients.

99.     The Offer, from Ohio National's perspective, was unsuccessful.  Many

Commonwealth Representatives, including Ms. Benison, advised most of their customers not to

accept the Offer because the "new" annuity would not provide the high level of guaranteed

financial return available under the existing GMIB Annuities.

100.    As a result, out of the approximately 232 Commonwealth clients eligible for the

"swap," only approximately sixteen (16) Contracts were "swapped," representing less than 7%.

Only one, out of twenty-five, of Ms. Benison's clients made the "swap."

**Ohio National Offers a Second Variable Annuity Exchange "Opportunity."**

101.    On May 11, 2018, Ohio National published a supplement to its May 1, 2018 ONcore Variable Annuity Prospectuses, offering *another* exchange for each customer's ONcore Contract with GMIB Rider (the "Second Offer").  A true and accurate copy of the May 11, 2018 Supplement ("Second Offer") is attached hereto as Exhibit K.

102.    The Second Offer appeared to apply to all ONcore Variable Annuity products with a GMIB Rider, and the offer period lasted from June 4, 2018 to September 7, 2018.  See Ex. K, at 1-2.

103.    Ohio National again acknowledged the possibility of it receiving a financial benefit:

> We could gain a financial benefit from the Offer because, due to regulatory changes and a prolonged period of low interest rates, supporting the guarantees associated with the eligible ONcore variable annuities and the Eligible GMIB riders may be more expensive for us than the guarantees associated with the ONdex fixed indexed annuities and the GLWB riders.

See Ex. K, at 8.

104.    Ohio National acknowledged also that the Second Offer might create a conflict of interest between clients and their advisors:

> Your financial professional may receive compensation from his or her broker-dealer due to the exchange.  Such compensation may be higher or lower than the compensation they would receive if you did not accept the Offer and maintained your ONcore variable annuity, which may provide them an incentive in recommending whether or not you should accept the Offer.

See Ex. K, at 8.

105.    As part of the Second Offer, Ohio National created two letters:  one to send to Representatives, and one to give customers.  A true and accurate copy of the letter for Representatives ("Second Offer Representative Letter") is attached hereto as Exhibit L.

106.     Ohio National's letter for Representatives highlighted the economic incentive for Representatives to counsel their clients to accept the Second Offer: "We value our relationship with you, so please note that this exchange will count as a new sale and compensation will be applied accordingly."  See Ex. L.

107.     The Second Offer Representative Letter again stated also that the Second Offer was in Ohio National's interest: "Ohio National could gain a financial benefit, because … supporting the guarantees associated with the VA contracts and GMIB riders may be more expensive for us than the guarantees associated with the FIA contracts and GLWB riders."  See Ex. L, at 1.

108.     On May 14, 2018, Ohio National advised Commonwealth in an email that the Second Offer applied only to Contract holders in California.  A true and accurate copy of the May 14, 2018 Email ("Second Offer Email") is attached hereto as Exhibit M.

109.     The Second Offer potentially affected five (5) Commonwealth clients.

110.     The Second Offer, from Ohio National's perspective, was again unsuccessful. Indeed, of the five Commonwealth clients eligible for the "swap," zero Contracts were "swapped."

**Ohio National Notifies Commonwealth that
it is Terminating the Selling Agreement Effective December 2018, and
States its Intention to Stop Paying Compensation at that Time.**

111.     In a letter dated September 20, 2018, Commonwealth was advised by Ohio National that Ohio National was terminating the Selling Agreement effective December 12, 2018.  See Ex. D.

112.    The Termination Letter stated also that, "[y]ou will be receiving information shortly about the terms for servicing your clients after termination of the selling agreement." See Ex. D.

113.    Commonwealth then received a second letter from Ohio National, dated September 21, 2018, stating that all compensation under the Selling Agreement, including trail commissions, would end upon termination of the Selling Agreement, or on December 12, 2018. See Ex. E.

114.    As noted above, Ohio National's stated position -- that all compensation under the Selling Agreement, including trail commissions, would end upon termination of the Selling Agreement -- is directly contradicted by the Addendum, which provides expressly that such compensation "shall continue to be payable to Commonwealth Equity Services, Inc. for as long as they are listed as the Broker-Dealer of record[.]" See Ex. C.

### Ohio National Offers Commonwealth a "Servicing Agreement."

115.    At the same time it provided notice of termination of the Selling Agreement and its position that it would stop all compensation (including trail compensation), Ohio National claimed that, if Commonwealth agreed to sign a new "Servicing Agreement," Commonwealth and its Representatives could "continue to service your clients with Ohio National contracts." See Ex. E.

116.    The Servicing Agreement Letter then stated that, "[t]he Servicing Agreement also provides for a service fee to be paid to you for your clients with Ohio National individual annuity contracts, *except for contracts which contain a Guaranteed Minimum Income Benefit rider.*" See Ex. E.  (Emphasis supplied.)

117.    The Servicing Agreement Letter stated that the Servicing Agreement was to be completed and returned to Ohio National by December 13, 2018.

118.    Moreover, under the Servicing Agreement (as opposed to the Selling Agreement) Ohio National would provide compensation only for select Contracts:

> In exchange for the Services provided under this Agreement, ONL agrees to pay BD a service fee (the 'Service Fee') equivalent to the compensation provided for in the compensation schedules appended to the Selling Agreement for the Contracts listed on the schedule attached to this Agreement (the 'Listed Contracts').

Ex. F, ¶8.

119.    As described in the Servicing Letter, GMIB Riders were excluded: "any individual contract that, as of the date of this Agreement, includes a guaranteed minimum income benefit rider ('GMIB') is excluded." See Ex. F, at 7.

120.    Further, the Servicing Agreement specifically provided that Ohio National can unilaterally terminate the Servicing Agreement and, once terminated, Ohio National will no longer pay Commonwealth any compensation on any Contracts: "Termination of this Agreement, for any reason, shall also terminate any right of BD to receive future compensation payments from [Ohio National][.]" See Ex. F, ¶8.

**Commonwealth Contacts Ohio National Seeking Information and Representations of Future Compliance but Ohio National Fails to Respond.**

121.    On October 9 and 11, 2018, Commonwealth sent emails to Ohio National using the email address provided in the Servicing Agreement Letter (legal@ohionational.com) requesting information on the termination of the Selling Agreement, the termination of trail commissions, and the effect of signing the new Servicing Agreement.  True and accurate copies of the October 9 and October 11, 2018 emails are attached hereto as Exhibit N.

122.     In pertinent part, the October 11, 2018 email requested that Ohio National identify the language in the Selling Agreement upon which the following Ohio National assertion was based: "[p]ursuant to your selling agreement, all individual annuity trail compensation under the selling agreement will cease at that time."  See Ex. N.

123.     Commonwealth made this request because, among other things: (1) no such language appears in the Selling Agreement; and (2) language in the Addendum directly contradicts Ohio National's assertion – i.e. "shall continue to be payable to Commonwealth Equity Services, Inc. for as long as they are listed as the Broker-Dealer of record[.]"  Ex. C.

124.     Ohio National failed to provide any response to the October 9 and October 11 emails.

125.     By letter dated October 15, 2018, Ohio National was reminded of its obligations under the Selling Agreement and the incorporated Addendum.  Commonwealth indicated that it was prepared to undertake legal means to enforce the Addendum.  A true and accurate copy of the October 15, 2018 letter ("Demand Letter") is attached hereto as Exhibit O.

126.     The Demand Letter also asked for specific factual representations to determine whether Ohio National intended to comply with the terms of the Addendum; namely, whether Ohio National would continue to pay, "'all commissions, remuneration, expense allowances, and credits' including without limitation individual annuity trail compensation, after December 12, 2018."  See Ex. O, at 2.

127.     The Demand Letter asked also about what would occur if Commonwealth did not sign the new Servicing Agreement; specifically asking, among other things, whether Commonwealth would remain the broker dealer of record for all Ohio National securities products sold by Commonwealth Representatives, and whether Commonwealth Representatives

would still have access to client information and the ability to service the Ohio National

securities products.  See Ex. O, at 3.

128.    The Demand Letter also asked bluntly whether Ohio National truly intended to

cease paying all compensation owed to Commonwealth with respect to those annuities sold with

a GMIB Rider, regardless of whether Commonwealth signed the new Servicing Agreement.  See

Ex. O, at 4.

129.    Ohio National failed to provide any substantive response to the Demand Letter.

Instead, Ohio National sent a letter stating in full:

> Your letter of October 15, 2018, has been forwarded to our Firm for
> review and response.  We will be looking at these issues in the short
> term.  We did want to advise you, however, that the undersigned will
> be in trial for approximately two weeks and we thus will not be able
> to respond to you until thereafter.  Thank you in advance for your
> attention.

A true and accurate copy of the Demand Letter Receipt is attached hereto as Exhibit P.

130.    Upon information and belief, if Commonwealth does not sign the Servicing

Agreement, Ohio National will not compensate Plaintiffs in any way for servicing any Contracts.

### Ohio National's Unlawful Conduct is Widespread and Continues Even After Commonwealth Identified Its Concerns and Demanded Compliance.

131.    Approximately Ninety (90) Commonwealth Representatives are currently

servicing Ohio National Contracts that pay trail commissions.

132.    Commonwealth services approximately seven hundred and seventy-five (775)

Contracts from which it derives trail compensation ("Trail Contracts").

133.    Currently, Ohio National pays Commonwealth approximately one million dollars

($1,000,000) per year of trail compensation on Trail Contracts.

134.    On information and belief, if Commonwealth does not sign the Servicing Agreement, Ohio National will not pay Commonwealth any of the trail compensation.

135.    Instead, Ohio National will retain the approximately one million dollars ($1,000,000) per year in trail compensation it otherwise would have paid Commonwealth if the Selling Agreement was not terminated.

136.    Approximately fifty-seven (57) Commonwealth Representatives service Contracts with GMIB Riders ("GMIB Accounts").

137.    Commonwealth clients have paid over thirty-two million dollars ($32,000,000) in premiums on the GMIB Accounts.

138.    Of the Trail Contracts, approximately three hundred and fifty-nine (359) are GMIB Accounts.

139.    Ohio National pays Commonwealth approximately four hundred and fifty thousand dollars ($450,000) per year in trail compensation on the GMIB Accounts.

140.    If Commonwealth signs the Servicing Agreement, Ohio National will not pay Commonwealth any of this trail compensation.

141.    If Commonwealth does not sign the Servicing Agreement, Ohio National will still not pay Commonwealth any of this trail compensation.

142.    Instead, Ohio National will retain the approximately four hundred and fifty thousand dollars ($450,000) per year in trail compensation it otherwise would have paid Commonwealth if the Selling Agreement was not terminated.

### Ohio National Decides to Go Directly to Commonwealth Clients
### to Cause Those Clients to Terminate Annuities with a GMIB Rider.

143.    In its October 29, 2018 Email, Ohio National notified Commonwealth and affected Representatives that:

27

From **November 12, 2018 through February 11, 2019**, Ohio National is offering the opportunity for eligible clients to participate in a Buyout offer of their…variable annuity contract with Guaranteed Minimum Income (GMIB) rider.  By accepting this offer, clients will be cancelling their variable annuity contracts and all attached riders in exchange for an Enhanced Contract Value, which they may receive as a cash surrender or transfer to a financial product available from another financial institution.

See Ex. Q.

144.     The first of the sample client letters enclosed in the October 29, 2018 Email

targets clients with an annuity that contains a GMIB Rider:

RE:  Contract Number [Contract Number]

Dear [Name],

You worked with your financial professional to develop a plan that helped prepare you for retirement, and you included an Oncore variable annuity with an optional Guaranteed Minimum Income Benefit (GMIB) rider as part of that plan.

However, Ohio National recognizes that life changes, and since purchasing your variable annuity, your retirement goals might have changed.  This may include the flexibility of having more assets to address an immediate need or to reinvest these assets in another financial product better suited to address your new goals.

A true and accurate copy of the First Sample Client Letter is attached hereto as Exhibit R.

145.     Ohio National then purports to give the recipient of the notice an "understanding

of this buyout offer":

Ohio National is pleased to offer you an opportunity to enhance your financial assets in return for your agreement to cancel your Oncore variable annuity contract and guaranteed benefits.  Deciding whether to accept this offer is an important decision.  You may wish to work with a trusted financial professional to evaluate your retirement plan and retirement income needs to determine if this offer is right for you.

See Ex. R.

146.     In that same letter, according to Ohio National:

By accepting this offer, your variable annuity's Contract Value will be enhanced

by an amount equal to the greater of:

1. An Enhancement Amount equal to 50% (the 'Enhancement Percentage') of the Enhancement Base, which is defined as your Contract Value subtracted from the value of your GMIB rider's Guaranteed Earnings Income Base (GEIB), up to a maximum of 20% of the GEIB value; or

2. A Minimum Enhancement Amount equal to 7.5 % (the 'Minimum Enhancement Percentage') of your Contract Value[.]

You may then receive the Enhanced Contract Value as a cash surrender or transfer it to a financial product available from another financial institution.  In addition, we'll waive any and all charges associated with surrender if you accept the Buyout Offer.

See Ex. R.

147. Ohio National then attempts to "explain" to the client the economics of the proposed buyout:

**Contract and rider values**
As of the date of this letter, your Contract Value, GEIB value and enhanced values are as follows:

Enhancement Amount Calculation

Step 1.

$[GEIB Value] - $[Contract Value] = $[Enh Base]

GEIB Value – Contract Value = Enhancement Base

Step 2.
$[Enh Base] x 50% = $[Enh Amount]
Enhancement Base x Enhancement Percentage = Enhancement Amount*
*The Enhancement Amount cannot exceed 20% of the GEIB Value[, or $Ehn Max].

Minimum Enhancement Amount Calculation

Step 1.

$[Contract Value] x 7.5% = [Min Ehn Amount]
Contract Value x Minimum Enhancement Percentage = Minimum
Enhancement Amount

If you accept this offer, the greater of the two enhancement values above ($[ENH Amount] and $[Min Enh Amount] will be added to your Contract Value as of the date all requirements are received in good order.

**As a result, your Enhanced Contract Value as of the date of this letter would be $[Ehn Contract Value].**

See Ex. R, at 2 (Emphasis original).

148.    Then, in bold faced language, the client is warned that:  "**You may only accept the offer between November 12, 2018 and February 11, 2019.**  However, we may choose to end the offer period sooner, in which case you will be notified."  See Ex. R, at 3.

149.    Notably, nothing in the sample client letter indicates to the client that Ohio National sent a copy of the letter to his/her Representative.

150.    The second sample client letter addresses the same subject matter as the first, but appears to be directed to clients who purchased a variable annuity that has both a GMIB Rider and an "Annual Reset Death Benefit Rider[.]"  A true and accurate copy of the Second Sample Client Letter is attached hereto as Exhibit S.

151.    As noted, the third enclosure was "[a] copy of the GMIB Buyout Offer Acceptance Form" (the "Buyout Form").  A true and accurate copy of the Buyout Form is attached hereto as Exhibit T.

152.    The Buyout Form begins with a representation to be made by the targeted client:

I understand that, by signing this form, I am accepting Ohio National's offer to enhance my Contract Value in return for my agreement to terminate my variable annuity and any associated rider(s).

See Ex. T.

153.   The Form then gives the client only two options:

I want to transfer/exchange my full Enhanced Contract Value to a financial product available from another financial institution.
***
I want to take receipt of the Enhanced Contract Value as a Full Surrender[.]

See Ex. T.

154.   At the end of the client's signature line is an asterisk that "leads" the client to fine print at the bottom of the document.  Remarkably, the language purports to provide Ohio National with a general release and also contains hold harmless language:

The above-signed hereby agrees, for ourselves, and, if any, our subsidiaries, agents, employees and directors at all times to indemnify and hold harmless The Ohio National Life Insurance Company (ONLIC), each of its subsidiaries, agents, employees and directors against any and all claims, liabilities, damages, demands, actions, controversies, charges, expenses and losses sustained or incurred on ONLIC's actions in making the change requested above and release the same from any liability arising from the execution of this transaction.

See Ex. T, at 3.

155.   It is therefore clear that Ohio National now intends to circumvent or reduce the influence of the Representatives by going directly to the clients of the Representatives and dangling cash in front of those clients; presumably because Ohio National believes the agreements it made with Commonwealth, with the Representatives and, ultimately, with the clients, are no longer in the best interests of Ohio National.

156.   Thus, Ohio National is taking direct, concerted effort to have Plaintiffs' clients terminate their Contracts with the GMIB Rider.

157.   Upon information and belief, Ohio National intends to take the position that if Plaintiffs' client accepts the Buyout Offer, Ohio National will not pay any future trail commissions to Plaintiffs relating to that client's Contract.

**Ohio National's Unlawful Behavior Continues to Irreparably Harm Plaintiffs.**

158.    On information and belief, Ohio National's termination of the Selling Agreement and unlawfully ceasing to pay trail commissions is intended to pressure Commonwealth to enter into the Servicing Agreement and, thereby, to agree to terms that are different from what was agreed to by way of the Selling Agreement.  Ohio National, also on information and belief, seems to want the ability to claim that Commonwealth has waived or released rights under the Selling Agreement.

159.    The Servicing Agreement is detrimental to Commonwealth because it would provide no compensation to Commonwealth or its Representatives for servicing Ohio National GMIB Annuities.  Additionally, the Servicing Agreement provides that any compensation in the form of a service fee can be withdrawn unilaterally by Ohio National.

160.    On information and belief, Ohio National's unlawful conduct is also intended to induce Commonwealth and its Representatives to counsel their customers, regardless of whether it is in the clients' best interest, to surrender their GMIB Annuities for other alternative consideration, or alternatively, to create disincentives for Plaintiffs to provide advice to their clients.

161.    As noted, it now appears that Ohio National intends to directly, and unlawfully, induce Commonwealth customers to exchange their current GMIB Annuities for other, less suitable consideration, while trying to limit the involvement of the Representatives who take care of those clients.

162.    Ohio National's improper conduct has caused and is continuing to cause damage and irreparable harm to Plaintiffs, including the loss of goodwill and the negative impact to Plaintiffs' relationships and reputation.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment Relief (28 U.S.C. §§ 2201–2202)

163.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully stated herein.

164.    Plaintiffs request that this Court declare that: both prior to and after the termination of the Selling Agreement, Ohio National are obligated pursuant to the Selling Agreement to pay all trail compensation to Commonwealth on all Contracts (as defined in the next sentence) for as long as Commonwealth remains listed as the Broker Dealer of Record for the Contract, and failure to do so is a breach of the Selling Agreement.  "Contract" means a product of Ohio National (including without limitation all variable annuities with a Guaranteed Minimum Income Benefit Rider) owned by a Commonwealth client and which (a) was sold pursuant to the Selling Agreement (Exs. A-C) and (b) is in force as of the date this Judgment is declared.  The trail compensation to be paid by Ohio National to Commonwealth shall be calculated and paid in the same manner as Ohio National were paying Commonwealth immediately prior to the filing of this action.

165.    Plaintiffs request that this Court declare that: notwithstanding any provision in the Servicing Agreement or the Selling Agreement, and notwithstanding the termination of the Selling Agreement, if Commonwealth signs the Servicing Agreement Ohio National still has the same obligations as those set forth in the immediately preceding Paragraph;

166.    There is an actual and justiciable controversy between the parties with regard to these issues.

### COUNT II
### Breach of Contract

167.    Plaintiffs repeat, reallege and incorporate by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

168.    Ohio National and Commonwealth are parties to the Selling Agreement, which is a binding and enforceable contract.

169.    Ohio National and Commonwealth intended for Commonwealth Representatives, including Ms. Benison, to be intended beneficiaries of the Selling Agreement.

170.    The Representatives, including Ms. Benison, are intended third-party beneficiaries to the Selling Agreement.  The language and context of the Selling Agreement indicates an intent to benefit the Representatives, including Ms. Benison.

171.    Recognition of a right to performance in the Representatives, including Ms. Benison, is appropriate to effectuate this intention and the circumstances indicate that Commonwealth intends to give the Representatives, including Ms. Benison, the benefit of Ohio National's promised performance.

172.    Commonwealth has at all times fulfilled its obligations, if any, under the Selling Agreement.

173.    Ohio National is contractually required to pay commissions, including trail commissions, to Commonwealth after the termination of the Selling Agreement.

174.    As noted above, Ohio National has clearly and unequivocally informed Commonwealth that it will not pay any commissions after the termination of the Selling Agreement.

175.    As a direct and proximate result of Ohio National's anticipated breach and unlawful conduct, Commonwealth and its Representatives, including Ms. Benison, will be damaged, and Ohio National is therefore liable to Plaintiffs in an amount to be determined by the

Court, together with costs, interest and attorneys' fees as allowable by law.  In addition, Plaintiffs are entitled to specific enforcement of the terms of the Selling Agreement by way of declaratory judgment and injunctive relief.

### COUNT III
### Breach of Implied Covenant of Good Faith and Fair Dealing

176.    Plaintiffs repeat, reallege and incorporate by reference each and all of the allegations contained in the preceding paragraphs as if fully stated herein.

177.    All contracts include an implied covenant of good faith and fair dealing, which requires that neither party take any action that will deprive the other of the benefit of the contract between them.  The Selling Agreement contains an implied covenant of good faith and fair dealing.

178.    Ohio National acted, and continues to act, as set forth above, without good faith and/or in bad faith in connection with breaches of the covenant of good faith and fair dealing that is implicit in the Selling Agreement.

179.    Plaintiffs have been and continue to be damaged as a proximate result of Ohio National's breaches of the covenant of good faith and fair dealing.

180.    By virtue of the foregoing, Ohio National are liable to Plaintiffs for damages in an amount to be determined by the Court, together with costs and interest to the extent permitted by law.  In addition, Plaintiffs are entitled to specific enforcement of the terms of the Selling Agreement by way of declaratory judgment and injunctive relief.

### COUNT IV
### Fraud

181.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully stated herein.

182.    Ohio National represented to Commonwealth during Selling Agreement negotiations that Ohio National would continue to pay Commonwealth trail commissions upon termination of the Selling Agreement as memorialized and agreed to in the commission section of the Addendum.

183.    On information and belief, at the time Ohio National made that representation, Ohio National knew it was false and that, subsequent to the execution of the Selling Agreement, Ohio National would in fact not pay Commonwealth trail commissions upon termination of the Selling Agreement.

184.    On information and belief, Ohio National made the false representation to induce Commonwealth to sign the Selling Agreement.

185.    It was material to Commonwealth, before signing the Selling Agreement, that Ohio National agreed to pay Commonwealth trail commissions upon termination of the Selling Agreement to ensure Commonwealth received all of its compensation under the Selling Agreement.

186.    Commonwealth reasonably relied on Ohio National's misrepresentation.

187.    Ohio National's misrepresentation has caused and/or will cause harm to Commonwealth.

188.    By virtue of the foregoing, Ohio National is liable to Plaintiffs for damages in an amount to be determined by the Court, together with costs and interest to the extent permitted by law, and injunctive relief.

**COUNT V**
**Tortious Interference with Plaintiffs' Actual and/or Prospective**
**Contractual and/or Business Relations**

189.   Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully stated herein.

190.   Plaintiffs have contractual and/or prospective business relations with their clients and prospective clients.

191.   Commonwealth has contractual and/or prospective business relations with its Representatives, including Ms. Benison.

192.   Ohio National was aware of those contractual and/or prospective business relationships.

193.   Without privilege or justification, Ohio National has purposefully and intentionally interfered with, and is continuing to interfere with, those relationships through improper means and/or with improper motive.

194.   Ohio National's tortious interference with Plaintiffs' contractual and/or prospective business relationships has caused and/or will cause damage to Plaintiffs.

195.   As a consequence thereof, Ohio National are liable to Plaintiffs in an amount to be determined by the Court, together with interest, costs and attorneys' fees as allowable by law, and injunctive relief.

**COUNT VI**
**Violation of Mass. Gen. Laws ch. 93A**

196.   Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully stated herein.

197.   At all times material hereto, Ohio National and Plaintiffs were and are engaged in trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, §§2 and 11.

198.    As alleged herein, Ohio National, while engaged in trade or commerce, intentionally, knowingly, willfully, recklessly and/or negligently committed unfair and deceptive acts and practices primarily and substantially in Massachusetts, and Plaintiffs have suffered and will continue to suffer the loss of money and property as a result thereof.

199.    Ohio National's actions, as alleged herein, constitute unfair or deceptive acts or practices, in violation of Mass. Gen. Laws ch. 93A, §11, that are within the penumbra of common-law, statutory, or other established concepts of unfairness; are immoral, unethical, oppressive, and/or unscrupulous; and have caused substantial injury to Plaintiffs.

200.    By virtue of the foregoing, Ohio National are liable to Plaintiffs for damages in an amount determined by the Court, together with up to three but not less than two times the amount of Plaintiffs' actual damages, as well as costs, interest and attorneys' fees.  In addition, Plaintiffs are entitled to injunctive relief and specific enforcement of the terms of the Selling Agreement by way of declaratory judgment.

## COUNT VII
## Unjust Enrichment

201.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully stated herein.

202.    Plaintiffs conferred a benefit on Ohio National by selling Ohio National's Variable Annuity to Plaintiffs' customers.

203.    Ohio National encouraged Plaintiffs to invest their time and financial resources and were aware of Plaintiffs actions in this regard, and knowingly accepted the benefits flowing therefrom.

204.    Ohio National have retained and/or will retain that benefit, to Plaintiffs' detriment, in a manner in which the result is unconscionable.

205.    Due to their actions, as described above, Ohio National have been or will be unjustly enriched at the expense of Plaintiffs.

206.    Ohio National are therefore required to make restitution to Plaintiffs for such unjust enrichment.

207.    As a direct and proximate result of Ohio National's unlawful conduct, Plaintiffs have suffered and/or will suffer damages.

208.    By virtue of the foregoing, Ohio National are liable to Plaintiffs in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and injunctive relief.

## COUNT VIII
## Injunctive Relief

209.    Plaintiffs repeat, reallege and incorporate by reference the allegations contained in each and all of the preceding paragraphs as if fully stated herein.

210.    Ohio National have no right to harm the goodwill and reputation of Plaintiffs through their interference with relationships created, maintained and developed by and at the expense of Plaintiffs.

211.    Ohio National have no right to extort extra-contractual promises and benefits from the Plaintiffs.

212.    Unless Ohio National are enjoined from the conduct described herein, Plaintiffs will continue to suffer irreparable harm including loss of goodwill, loss of reputation, and financial losses that are presently not calculable.  Commonwealth also faces the loss of leverage in pending contract negotiations with Ohio National if Ohio National are not enjoined from the conduct described herein.

213.    Plaintiffs have no adequate remedy at law.

214.    The irreparable harm that Plaintiffs will suffer if injunctive relief is denied outweighs the potential harm (if any) to Ohio National if injunctive relief is granted.  Plaintiffs have demonstrated a likelihood of success on the merits and that a balancing of the equities and the public interest favor the issuance of injunctive relief against Ohio National.

215.    It is unjust and inequitable to permit Ohio National to benefit from the deliberate disregard of Ohio National's contractual and legal obligations.

216.    The injunctive relief that Plaintiffs request would merely maintain the status quo requiring Ohio National to adhere to the Selling Agreement and its other legal obligations and is appropriate.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Enter judgment in favor of Commonwealth and against Ohio National on all Counts;

2.    Declare that, both prior to and after the termination of the Selling Agreement, Ohio National are obligated pursuant to the Selling Agreement to pay all trail compensation to Commonwealth on all Contracts (as defined in the next sentence) for as long as Commonwealth remains listed as the Broker Dealer of Record for the Contract, and failure to do so is a breach of the Selling Agreement.  "Contract" means an Ohio National product (including without limitation any variable annuity with a Guaranteed Minimum Income Benefit Rider) owned by a client of Commonwealth and/or Margaret Benison and which (a) was sold pursuant to the Selling Agreement (Exs. A-C) and (b) is in force as of the date of this judgment.  The trail compensation to be paid by Ohio National to Commonwealth shall be calculated and paid in the same manner as Ohio National were paying Commonwealth immediately prior to the filing of this action.

3.     Declare that, notwithstanding any provision in the Servicing Agreement or Selling Agreement, and notwithstanding the termination of the Selling Agreement, if Commonwealth signs the Servicing Agreement (Ex. F) Ohio National still have the same obligations as those set forth in the immediately preceding Paragraph;

4.     Order Ohio National to pay damages to Commonwealth in an amount determined by the Court, including all costs, interest, multiple damages and attorneys' fees allowed by contract and/or law;

5.     Enter a temporary, preliminary and permanent injunction ordering as follows:

   a.     For the purposes of this Order, "Contract' means an Ohio National product (including without limitation any variable annuity with a Guaranteed Minimum Income Benefit Rider) owned by a client of Plaintiff Commonwealth Equity Services, LLC ("Commonwealth") and/or Plaintiff Margaret Benison and which (a) was sold pursuant to the Selling Agreement (Exs. A-C), and (b) is in force as of the date of this Order.

   b.     Defendants, regardless of whether Plaintiffs sign the Servicing Agreement (Ex. F) must immediately cease and desist from taking any action which interferes with or impedes Plaintiffs' ability to: (a) access information concerning any Contract, including without limitation online access to such information, and/or (b) otherwise service Plaintiffs' clients who own a Contract, including that Defendants are required to provide Plaintiffs at least five days advance notice of any planned contact or communication with Plaintiffs' clients and provide Plaintiffs with a copy of all written communications with any such client which relates to a Contract.

   c.     Defendants, both prior to and after the termination of the Selling Agreement, must continue to pay all trail compensation to Commonwealth on every Contract for as long as Commonwealth remains listed as the Broker Dealer of Record for the Contract.  The trail compensation to be paid by Defendants to Commonwealth shall be calculated and paid in the same manner as Defendants were paying Commonwealth immediately prior to the filing of this action.

   d.     If Commonwealth signs the Servicing Agreement, notwithstanding any provisions in the Servicing Agreement or Selling Agreement, and notwithstanding the termination of the Selling Agreement, (a) Defendants shall have the same obligations as those set forth in the immediately preceding Paragraph; and (b) Commonwealth's execution of the Servicing

41

Agreement cannot be construed as a release, waiver or relinquishment of any of its rights, if any, under the Selling Agreement;

e.   This matter is hereby stayed and the parties are hereby directed to proceed with arbitration in the FINRA forum in accordance with the agreement to arbitrate in the Addendum (Ex. C) to the Selling Agreement (Ex. A), said arbitration to cover any and all controversies arising out of or in connection with this matter.

f.   This Order shall remain in full force and effect until the earlier of: (a) such time as this Court specifically orders otherwise; or (b) the FINRA Arbitration Panel orders otherwise.

6.   Grant Plaintiffs such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims.

Respectfully submitted,

COMMONWEALTH EQUITY SERVICES, LLC d/b/a COMMONWEALTH FINANCIAL NETWORK, and MS. BENISON,

By their attorneys,

/s/ Steven L. Manchel
Steven L. Manchel (BBO #551066)
Michael G. Donovan (BBO #564257)
MANCHEL & BRENNAN, P.C.
100 River Ridge Drive, Suite 308
Norwood, MA  02062
(617) 796-8920
(617) 796-8921 (fax)
smanchel@manchelbrennan.com
mdonovan@manchelbrennan.com

Dated:  November 5, 2018

## VERIFICATION

I, Ethan Young, state that I have read the foregoing Verified Complaint, that I am authorized to make this Verification on behalf of Plaintiff Commonwealth Equity Services, LLC and that the factual allegations contained in Paragraphs 1- 162 herein are true and based on personal knowledge or information made available to me which I believe to be true to the best of my knowledge, information and belief.  This statement is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury.

Executed on November 5, 2018.

Ethan Young
Director, Insurance and Annuities
Commonwealth Equity Services, LLC

## VERIFICATION

    I, Margaret Benison, state that I have read the foregoing Verified Complaint and that the factual allegations contained in Paragraphs 4-5, 7, 17-18, 27, 31, 33, 36, 51, 53-54, 58, 80, 99-100, 143-154, and 160-162 herein are true and based on personal knowledge or information made available to me which I believe to be true to the best of my knowledge, information and belief.  This statement is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn declarations under penalty of perjury.

    Executed on November 5, 2018.

                                       Margaret Benison