UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH EQUITY SERVICES, LLC d/b/a COMMONWEALTH FINANCIAL NETWORK and MARGARET BENISON,<br><br>Plaintiffs,<br><br>v.<br><br>THE OHIO NATIONAL LIFE INSURANCE COMPANY; OHIO NATIONAL LIFE ASSURANCE CORPORATION; and OHIO NATIONAL EQUITIES, INC.,<br><br>Defendants. | Civil Action No. 18-12314-DJC |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO COMPEL FINRA ARBITRATION AND STAY COURT PROCEEDINGS**

Plaintiffs Commonwealth Equity Services, LLC ("Commonwealth") and Margaret Benison ("Benison") (collectively "Plaintiffs") hereby submit this Memorandum in support of their Motion to Compel FINRA Arbitration and Stay Court Proceedings.

## I.      INTRODUCTION

Plaintiffs seek to compel arbitration against Defendants Ohio National Equities, Inc. ("ON Equities"), The Ohio National Life Insurance Company ("ON Insurance"), and Ohio National Life Assurance Corporation ("ON Assurance") (collectively "Ohio National") arising from Ohio National's breach of their Selling Agreement ("Selling Agreement") with Commonwealth and intended beneficiary Benison, a Commonwealth representative.

This dispute must be arbitrated in Financial Industry Regulatory Authority ("FINRA") Arbitration because: (1) Defendants' Broker-Dealer (ON Equities), Commonwealth, and Benison are subject to mandatory arbitration pursuant to the FINRA Code of Arbitration Procedure

("FINRA Code"), §13200; and/or (2) all Defendants are signatories to the Selling Agreement's Addendum which contains a voluntary agreement to arbitrate this dispute with FINRA.

## II.   NATURE AND STATUS OF PROCEEDINGS

Plaintiffs initiated arbitration by filing a Statement of Claim with FINRA in accordance with the FINRA Code §13804(a)(2).[1]  The Statement of Claim arises from Ohio National's breach of the Selling Agreement; breach of the implied covenant of good faith and fair dealing; fraud; and c. 93A violation, and seeks monetary damages and permanent injunctive relief.

At the same time, Plaintiffs filed a virtually identical Court Complaint seeking temporary injunctive relief.[2]  Prior to filing the injunctive motion in Court, Plaintiffs sent Ohio National a Local Rule 7.1 letter asking to confer.[3]  In its response,[4] Ohio National stated:

> Given that your clients have filed an arbitration complaint and are seeking to proceed with the same, **we would like a commitment that Plaintiffs will dismiss all demands for relief** in the above-referenced action except for the prayer for injunctive relief. **Otherwise**, after having conferred with you pursuant to Local Rule 7.1, **we intend to file a motion to dismiss.**

Ex. B, 1-2.

Thus, Ohio National conceded that the only matter to be addressed in court was temporary injunctive relief in accordance with FINRA Code §13804.  However, inexplicably, Ohio National has now reversed its position and argues, both in this Court and in FINRA, that the entire dispute should be addressed in Court, not FINRA Arbitration.[5]  See Joint Statement of the Parties (Doc. 14), 6; Ex. C, 1-2.

---

[1] FINRA Case No. 18-03835.  See Joint Statement of the Parties (Doc. 14), 3.
[2] FINRA Arbitration does not provide for temporary injunctive relief but FINRA Code §13804 allows parties to seek such temporary relief in court after having filed a FINRA Statement of Claim.
[3] A true and accurate copy of the November 5, 2018 letter is attached hereto as Exhibit A.
[4] A true and accurate copy of the November 6, 2018 letter is attached hereto as Exhibit B.
[5] A true and accurate copy of Ohio National's FINRA Statement of Preliminary Answer and Statement of Non-Arbitrability is attached hereto as Exhibit C.  Through Local Rule 7.1 conference, the Parties have discussed and resolved several issues resulting in Plaintiffs deciding not to pursue temporary injunctive relief in court.

### III.    <u>FACTUAL BACKGROUND</u>[6]

**A.  Parties.**

Ohio National are three Ohio companies. <u>Verified</u> <u>Complaint</u> ("Comp."), ¶¶1, 29-31; <u>Answer</u>, ¶¶29-31. ON Equities is a Broker-Dealer which distributes variable annuity contracts issued by ON Insurance and ON Assurance, two insurance companies which are the parent of ON Equities.  <u>Id.</u>, ¶¶29-31, <u>Exs.</u> A, G at 12, 26.[7]  Commonwealth, a Massachusetts corporation, is a Broker-Dealer in the business of selling securities products through its Representatives, including Benison, who is a FINRA Associated Person.  <u>Id.</u>  ON Equities and Commonwealth are Members of FINRA.  <u>Id.</u>, ¶¶1, 30, <u>Exs.</u> A at ¶2, G at 26;[8] <u>Answer</u>, ¶30.

**B.  Selling Agreement.**

In 1998, Ohio National entered into a Selling Agreement with Commonwealth, pursuant to which Commonwealth (through its Representatives) agreed to sell Ohio National's Contracts such as variable annuities.  <u>See</u> <u>Comp.</u>, ¶1, <u>Exs.</u> A at 1,[9] B, C and Q; <u>Answer</u>, ¶1.  Under the Selling Agreement, Commonwealth and its Representatives, such as Benison, became independent contractors of Ohio National.  <u>See</u> <u>Comp.</u>, Ex. A at ¶16.  To sell the Contracts under the Selling Agreement, Commonwealth's Representatives were required to become insurance agents of Ohio National, and Commonwealth was charged with aiding Ohio National in appointing and licensing the Representatives.  <u>Id.</u>, <u>Exs.</u> A at ¶4, G at 26.

Ohio National Contracts are securities sold by Commonwealth and their Representatives,

---

[6] A complete recitation of the factual background is contained in the Verified Complaint, which is incorporated herein by reference.

[7] ON Equities also underwrites each Contract.  <u>Id.</u>, <u>Exs.</u> A at 1, G at 26.

[8] "[ON Equities] and the broker-dealers are registered under the Securities Exchange Act of 1934 and are members of the Financial Industry Regulatory Authority."  <u>Comp.</u>, Ex. G, 26.

[9] "[Ohio National] and [ON Equities] propose to have [Commonwealth's] representatives ... who are, or will become, duly licensed insurance agents solicit sales of the Contracts."  <u>See</u> <u>Comp.</u>, ¶1, <u>Ex.</u> A, 1.

such as Benison, in forty-nine states.  Id., Exs. A at 1, G at 12, 26.[10]  Ohio National receives

revenue from the sale of each contract in the form of a premium paid on the contract by the

customer.  Id., ¶¶61 - 81, Exs. A – C.  Pursuant to the Addendum and Section 9 of the Selling

Agreement, Ohio National must pay commissions to Commonwealth for each contract sale.  Id.,

¶¶63 - 71, Exs. A – C.  The Selling Agreement and Prospectuses indicate that a portion of the

premium is paid to ON Equities which then distributes a portion of that to Commonwealth.  Id.,

Exs. A at ¶10,[11] G at 26.[12]  Additionally, the Selling Agreement required Commonwealth to enter

into a contract for the distribution of the compensation to its Representatives.[13]  Id., Exs. A at 9,

G at 26.

Ohio National announced the termination of the Selling Agreement, and informed

Commonwealth that no earned trail commissions would be paid post termination.  Id., ¶¶8-10,

Exs. A–D.  This action violates the express terms of the Selling Agreement Addendum which

provides:  "[A]t the termination of this contract all commissions … payable to Commonwealth

… shall continue to be payable to Commonwealth[.]"  Id., ¶¶8-10, Ex. C.

### C.  Written Agreement to Arbitrate.

The Selling Agreement Addendum includes a broad agreement between Commonwealth

and Ohio National that disputes "shall be submitted to arbitration in accordance with the Code of

Arbitration Procedure of the NASD, or similar rules or code in effect on the date of the

---

[10] "[Ohio National]... issue certain variable insurance contracts/policies ("Contracts") described in this Agreement, which are deemed securities under the Securities Act of 1933." Comp., Ex. A, 1.  "The variable annuity contracts are sold by our insurance agents who are also registered representatives of broker-dealers that have entered into distribution agreements with [ON Equities], a wholly-owned subsidiary of ours." Id., Ex. G, 26.

[11] "If [Ohio National] is required to refund premiums or return contract values and waive surrender charges on any Contract for any reason, in the first eighteen months of any Contract, then no commission will be payable … and any commission previously paid for said premiums must be refunded to ON Equities." Id., Ex. A, ¶10.

[12] "We pay [ON Equities] up to 4.50% of each purchase payment and [ON Equities] then pays part of that to the broker-dealers. The amounts may vary by broker-dealer." Id., Ex. G, 26.

[13] "Compensation to the BD's Representatives for Contracts solicited by the Representatives and issued by [Ohio National] will be governed by agreement between BD and its Representatives and its payment will be the BD's responsibility." Id., Ex. A, ¶9.

submission of any such dispute." <u>See</u> <u>Comp.</u>, <u>Ex.</u> C.  Additionally, the Selling Agreement states that Ohio National and Commonwealth agree to abide by all rules and regulations of the NASD. <u>Id.</u>, <u>Ex.</u> A, ¶3.

## IV.   <u>ARGUMENT</u>

The present dispute is subject to FINRA Arbitration for three (3) independent reasons.  First, based on their membership in FINRA, ON Equities, Commonwealth and Benison are subject to mandatory arbitration pursuant to FINRA Code §13200(a).  Second, Ohio National and Commonwealth are signatories to the Selling Agreement, which includes an Addendum containing an agreement to arbitrate this dispute in FINRA.  <u>See</u> <u>Comp.</u>, <u>Exs.</u> A–C, G; <u>Answer</u>, ¶¶1, 29-31. Third, Ohio National is also required to arbitrate Benison's claims because she is a third-party beneficiary of the Selling Agreement.  Thus, Ohio National should be compelled to FINRA Arbitration and the entire court case stayed.

In the alternative, if this Court compels arbitration between some, but not all of the parties, the case should be stayed in this Court pending the outcome of said arbitration.

### A.  ON EQUITY, COMMONWEALTH AND BENISON ARE SUBJECT TO MANDATORY ARBITRATION PURSUANT TO FINRA CODE §13200.

#### 1.  <u>FINRA Code §13200(a).</u>

ON Equities, Commonwealth and Benison are subject to mandatory arbitration pursuant to FINRA Code §13200(a), which provides:

> Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or • Associated Persons.

<u>Id.</u>

FINRA Code §13200(a) clearly applies because it is undisputed that: (1) ON Equities and Commonwealth are Broker-Dealers who are Members of FINRA (<u>Verified</u> <u>Complaint</u>, ¶¶1, 30,

Exs. A at 1, ¶2, G at 26; Answer, ¶30); (2) Benison is a representative registered with FINRA

and an Associated Person (Id., ¶27) and (3) the dispute arises out of the business activities of

Commonwealth, ON Equities and/or Benison – i.e. the business activities described in the

Selling Agreement, namely the sale of variable annuities.  As such, those three parties are subject

to mandatory arbitration pursuant to FINRA Code §13200(a).

Membership in self-regulatory organizations such as FINRA[14] are contractual in nature and

the rules of such organizations are sufficient to compel arbitration under the FAA.  See Paul Revere

Variable Annuity Ins. Co. v. Zang, 248 F.3d 1, 9 (1st Cir. 2001) (compelling arbitration in FINRA

based on parties' FINRA membership); Fenton v. Linsco/Private Ledger Corp., 1996 WL 464045,

*2 (D.Mass., 1996) (same); McCulloch v. Janney Montgomery Scott L.L.C., 2014 WL 4627810, *6

(Ohio App. 7 Dist., 2014) (same); ON Equity Sales Co.v. FINRA Dispute Resolution, Inc., 2008

WL 281788,*4 (S.D. Ohio, 2008) (same).

## 2.  **FINRA Code §13200(b).**

Ohio National has not challenged the above analysis.  Rather, Ohio National simply

argues that FINRA Code §13200(b) is applicable and therefore arbitration is not mandatory.

FINRA Code §13200(b) – the so-called insurance business exception – provides that "Disputes

arising out of the insurance business activities of a **member that is also an insurance company** are

not required to be arbitrated under the Code."  Id. (emphasis added).

Ohio National's argument is misplaced for several reasons, including: (1) whether

FINRA Code §13200(b) is applicable to the facts here must be decided by FINRA Arbitrators,

not the Court; (2) §13200(b) cannot apply because it expressly only applies to insurance

---

[14] The NASD "changed its name to FINRA in 2007, but otherwise maintained its function and rules as a self-regulatory organization."  Shen v. CMFG Life Insurance Company, 2016 WL 1129308, *2 (D. Mass., 2016).  Courts continue to enforce NASD arbitration clauses through FINRA arbitration and interpret and enforce NASD's rules as applicable to FINRA.  Id.

companies and ON Equities is not an insurance company; and (3) §13200(b) only applies to disputes regarding "insurance business activities" which is not at issue in this dispute.

> **i.     FINRA Arbitrators, not the Court, Must Decide Whether FINRA Code §13200(b) Applies to the Facts of This Case.**

Once a court determines that the parties entered into a valid arbitration agreement, then it should order them to arbitrate and leave for the arbitrator all "'procedural' questions which grow out of the dispute and bear on its final disposition." John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964).  Courts should resolve only the "gateway dispute" of whether the parties are bound by a given arbitration agreement, i.e. the "question of arbitrability." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-86 (2002).  Specifically, any questions concerning an interpretation of FINRA rules (including whether FINRA Code §13200(b) is applicable) are for FINRA arbitrators to decide.  See Id.; Baker v. Schuler, 2002 -Ohio- 5386, ¶¶ 38-39, 2002 WL 31243491, *5–6 (Ohio App. 2 Dist., 2002) (holding that arbitrators are to decide whether the claims fell within the NASD insurance business exception).[15]

The United States Supreme Court has unequivocally held that "procedural questions" such as determinations of whether "conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." Howsam, 537 U.S. at 84-85.  In Howsam, the Supreme Court rejected the argument that a court should decide, as an initial matter, whether claims were "eligible" for arbitration under an NASD Rule.  Instead, the Supreme Court recognized that "the

---

[15] See also Paquette v. McDermott Investment Services, LLC, 2014 WL 5313945, *8 (D. Mass., 2014) (leaving question of whether claims were eligible for FINRA arbitration, or should be sent to AAA, to the FINRA arbitrators); ON Equity Sales Co., 2008 WL 281788 at *4 (holding that FINRA is to determine questions of eligibility, such as to whom NASD Rules apply); Hendricks v. UBS Fin. Services, Inc., 546 Fed. Appx. 514, 519 (5th Cir. 2013) (leaving to FINRA arbitrators the interpretation of FINRA's rule prohibiting class actions and the determination of whether to permit individual arbitration claims); FSC Sec. Corp. v. Freel, 14 F.3d 1310, 1312-13 (8th Cir. 1994) (holding that, when parties "expressly agree[] to have their dispute governed by the NASD Code of Arbitration Procedure," they have "adopted the entire NASD Code, including Section 35," which empowered NASD arbitrators "to interpret and determine the applicability of all provisions under this Code," the adoption of which "is a 'clear and unmistakable' expression of their intent to leave the question of arbitrability to the arbitrators").

NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it." Id. at 85.  As a result, the Court held that, "[i]n the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding." Id.  The Court expressly noted that NASD Rules state that "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code." Id. at 86 (citing NASD Code §10324[16]).  Consequently, the Court concluded that questions of eligibility under the NASD Rule were for the arbitrators.  Id.

Moreover, Ohio National is well aware that FINRA Arbitrators, not the court, decide the applicability of FINRA Rules.  In O.N. Equity Sales Co., ON Equity Sales, a subsidiary of ON Insurance, sought to avoid FINRA arbitration against claims by customers.  2008 WL 281788 at *1.  After several courts compelled ON Equity Sales to arbitrate, ON Equity Sales sued FINRA seeking to enjoin it from requiring ON Equity Sales to submit to arbitration.  Id.  ON Equity Sales claimed that its agreement to arbitrate in FINRA, based on the FINRA Code, applied only to "customer" disputes and that the numerous FINRA claimants were not "customers." Id. at *4.  The court denied the injunction, stating that under Howsam, the Supreme Court rejected the argument that a court should decide, as an initial matter, whether claims were "eligible" for arbitration under an NASD Rule.  Id. (citing Howsam, 537 U.S. at 85).  Instead, the court recognized that "the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it." Id.  The court found that it was for FINRA to determine questions of eligibility, such as to whom NASD Rules apply.  Id.

---

[16] The FINRA rules contain an identical provision: "The panel has the authority to interpret and determine the applicability of all provisions under the Code.  Such interpretations are final and binding upon the parties." FINRA Code §13413.

### ii.    FINRA Code §13200(b) Can Not Apply Because ON Equities is Not an Insurance Company.

Defendants admit that ON Equities is a broker-dealer and member of FINRA, and not an insurance company.  See Comp., ¶30; Answer, ¶30; Ex.C, 2 n. 1.  Therefore, FINRA Code §13200(b) does not apply to ON Equities.  Baker, 2002 -Ohio- 5386, ¶¶ 38-39, 2002 WL 31243491,*5–6 (argument that the insurance business exception applies "must fail because none of the defendants are insurance companies").

### iii.    FINRA Code §13200(b) Does Not Apply Because the Dispute Does Not Involve "Insurance Business Activities."

Even if ON Equities were an insurance company, it would not mean that any dispute automatically involves its "insurance business." Paul Revere Variable Annuity Ins. Co., 81 F.Supp.2d at 233–34.  To the contrary, courts have almost universally held that one party's status as an insurance company is not enough to trigger the exception.  Id.  Courts instead "examine the degree to which the pending claim is entangled with the company's insurance business." Id.[17] This court has held that, "[a]lthough the dispute may tangentially implicate general insurance business concepts, that fact does not transform" a dispute "into one that falls within the insurance business exception." Paul Revere Variable Annuity Ins. Co., 81 F.Supp.2d at 234.

To fall within the insurance exception, a complaint should raise **complex insurance law** questions.  Pitter v. Prudential Life Ins. Co. of America, 906 F. Supp. 130 (E.D. N.Y., 1995); Cular v. Metropolitan Life Ins. Co., 961 F. Supp. 550 (S.D. N.Y., 1997); Prudential Ins. Co. of America v. Shammas, 865 F. Supp. 429 (W.D. Mich., 1993); IDS Life Ins. Co. v. Royal Alliance Associates,

---

[17] See also Armijo v. Prudential Ins. Co. of America, 72 F.3d 793, 800 (10th Cir. 1995); Cular v. Metropolitan Life Ins. Co., 961 F.Supp. 550, 558 (S.D.N.Y., 1997); Vitone v. Metropolitan Life Ins. Co., 943 F.Supp. 192, 198 (D.R.I., 1996) (inquiring whether a "comprehensive evaluation" of the defendant's insurance business would be required to resolve the plaintiff's claims); Wojcik v. Aetna Life Ins. and Annuity Co., 901 F.Supp. 1282, 1291 (N.D.Ill., 1995); Young v. Prudential Ins. Co. of America, 297 N.J.Super. 605, 688 A.2d 1069, 1081 (1997) (looking to whether insurance practices are "at the heart of the case").

Inc., 266 F.3d 645 (7th Cir. 2001). Where there are no technical issues of insurance law present, arbitration proceeds, such as in a dispute where an insurer sells variable annuities. IDS Life Ins. Co., 266 F.3d at 652. "The purposes of the exclusion are to keep arbitrators away from issues that are peculiar to insurance, such as reserves, reinsurance, actuarial calculations, rates, coverage, and mandatory terms, and to prevent arbitrators from being swamped with insurance claims, which are apt to be more numerous than securities claims." IDS Life Ins. Co., 266 F.3d at 652 (citation omitted). Variable annuities are securities, and where a dispute concerning their sale does not implicate technical questions peculiar to insurance, the exception does not preclude arbitration. Id. If the claims concern general claims that require no special insurance industry knowledge for their resolution, the exception does not apply. Id.

Here, this is a breach of contract action involving securities, not a dispute that raises complex insurance law issues. The Selling Agreement describes the Contracts as securities registered under the Securities and Exchange Act of 1933. See Comp., ¶82, Exs. A at 1, G at 1; Answer, ¶82. The Verified Complaint alleges no causes of action the resolution of which requires an arbitrator to have technical knowledge peculiar to the insurance business. See Comp., ¶¶163-216.

## B. OHIO NATIONAL AND COMMONWEALTH ARE ALL SIGNATORIES TO THE SELLING AGREEMENT ADDENDUM'S BROAD ARBITRATION PROVISION THAT COVERS THE PRESENT DISPUTE.

The Selling Agreement Addendum includes a subsection which provides in full:

> Arbitration:
> **All parties** to this agreement submit and agree that all disputes between the parties of whatever nature or subject matter relating to the duties, obligations, representations, and warranties undertaken by this Agreement, and relating to this Agreement itself, whether existing on the date hereof or arising hereafter, **shall be submitted to arbitration in accordance with the Code of Arbitration Procedure of the NASD**, or similar rules or code in effect on the date of the submission of any such dispute.

Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction.

Comp., Ex. C (emphasis added).

### 1. The Current Dispute Falls Within the Scope of the Agreement to Arbitrate So This Dispute Must be Arbitrated.

Here, the arbitration provision is broad: disputes "of whatever nature or subject matter relating to the duties, obligations, representations, and warranties undertaken by this Agreement" *shall* be submitted to arbitration. Clearly, the disputes at issue here – breach of contract terms (i.e. payment of commissions), breach of implied covenant, etc. – fall within the scope of this arbitration provision. In such circumstances, the Court "shall" stay "any suit or proceeding ... brought ... upon any issue referable to arbitration ..." 9 U.S.C. § 3. Thus, all claims against all Defendants must be submitted to arbitration.

Courts regularly send cases to arbitration that have arbitration clauses that are narrower and less clear than the clause at issue here. For example, in Paquette, the court was confronted with a provision that was not as extensive as the provision at issue here, noting that it did "not use the sweeping language often found in arbitration agreements." Paquette, 2014 WL 5313945 at *7. Nevertheless, the Paquette court held that the liberal policy favoring arbitration requires courts to refer disputes to arbitration even when faced with an agreement that "is ambiguous as to whether claims ... are arbitrable." Id.[18] Where an arbitration clause is broad in scope, there is a presumption that the parties intended issues concerning arbitrability to be decided by the

---

[18] See also Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 9 (1st Cir. 2014); Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 223, 241–42 (1987) (holding that parties could be compelled to arbitrate RICO claims relating to, inter alia, making false statements and omitting material facts where brokerage agreement stated, "any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration" (internal quotation marks omitted)); Commercial Union Ins. Co. v. Gilbane Bldg. Co., 992 F.2d 386, 387–88, 391 (1st Cir. 1993) (holding that defendant's Massachusetts unfair and deceptive trade practices counterclaim was subject to arbitration where clause covered "[a]ll claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach thereof").

arbitrator.[19]

**2. Ohio National's Objections to Arbitration Must Be Addressed by a FINRA Arbitration Panel and, In Any Event, Fail as a Matter of Law.**

**i. FINRA Arbitrators, not the Court, Must Decide Challenges to the Application of the FINRA Code.**

It appears that Ohio National is challenging the scope or interpretation of the "in accordance with the Code of Arbitration Procedure of the NASD" language in the arbitration agreement and specifically the scope and application of FINRA Code §13200.  See Joint Statement of the Parties (Doc. 14) at 6-7.  As set forth in Section IV(A)(2)(i) above, questions concerning an interpretation of FINRA rules are for FINRA arbitrators to decide.  Thus, this Court should refer this matter to arbitration and Ohio National can argue its position in front of FINRA Arbitrators charged with interpreting the FINRA Code.

**ii. Ohio National's Argument Regarding FINRA §13200(a) is Simply Unavailing.**

Ohio National argues that the arbitration clause's "in accordance with" FINRA Code language prohibits arbitration because "the pertinent rules contained in FINRA's 'Industry' Code, and specifically FINRA Rule 13200, do not contemplate FINRA arbitration . . . by non-FINRA members, such as" ON Insurance and ON Assurance.  See Joint Statement of the Parties (Doc. 14), 6-7.  This argument is meritless for at least three (3) fundamental reasons.

First, the arbitration clause's reference to the FINRA Code has nothing to do with determining which parties agreed to arbitrate.  The clause is very clear that: "**All parties** to this agreement submit and agree that all disputes between the parties … **shall be submitted to arbitration[.]**"  Comp., Ex. C. (emphasis added).  All parties includes ON Insurance and ON Assurance.  Simply put, as is typical, the arbitration clause has two parts: (1) an agreement to

---

[19] See PaineWebber, Inc. v. Landay, 903 F.Supp. 193, 197 (D.Mass.,1995); Elahi, 87 F.3d at 594; Dialysis Access Center, LLC v. RMS Lifeline, Inc., 638 F.3d 367, 383 (1st Cir., 2011).

arbitrate, and (2) an agreement dictating the location and rules that will govern the arbitration –
i.e. FINRA.[20]

The plain and ordinary meaning of the arbitration provision makes clear that the parties
intended that disputes that arise between all of the parties shall be submitted to FINRA
arbitration.  See Comp., Ex. C.  When addressing a contract, the court's role is to give effect to
the intent of the parties.  Sunoco, Inc. (R & M) v. Toledo Edison Co., 953 N.E.2d 285, 292 (Ohio
2011); A.L. Prime Energy Consultant, Inc. v. Massachusetts Bay Transportation Auth., 479
Mass. 419, 429 (Mass. 2018).  The intent of the parties is determined by the plain and ordinary
meaning of the language used in the contract.  Id.  When the language is clear, a court may look
no further than the writing itself to determine the parties' intent.  Id.

Here, the plain language of the provision which states that disputes between all parties
"shall be submitted to arbitration," shows the intent of all parties.  The second part of the
arbitration provision plainly identifies FINRA as the arbitration forum, and that FINRA rules
will apply to the arbitration.  The arbitration provision requires the parties to submit this dispute
to FINRA arbitration in the manner provided by FINRA rules.  As such, Plaintiffs filed this case
in FINRA simultaneously to seeking Court ordered temporary injunctive relief as required under
FINRA Code §13804.

Second, Ohio National's argument is nonsensical because §13200(a) does not in any way
prohibit any party from voluntarily agreeing to FINRA Arbitration.  It does not in any way address
the issue of parties voluntarily agreeing to FINRA arbitration.  Rather, as stated in its title "Required

---

[20] See e.g. Prestera v. Shearson Lehman Bros., Inc., 1986 WL 10095, *5 (D.Mass., 1986) (compelling arbitration
where the agreement stated "Any controversy arising out of or relating to my accounts, to transactions with you for
me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in
effect, of the National Association of Securities Dealers, Inc."); Preston v. Ferrer, 552 U.S. 346, 361 (2008)
(enforcing arbitration where the agreement stated "'any dispute ... relating to ... the breach, validity, or legality'" of
the contract should be arbitrated in accordance with the American Arbitration Association (AAA) rules").

Arbitration," §13200(a) merely identifies the contours of mandatory arbitration.  Thus, the application of §13200(a) does not relieve ON Insurance and ON Assurance from its agreement to arbitrate which was entered into voluntarily by its signature on the Selling Agreement Addendum. As shown below in (iii), there are numerous examples of parties not subject to mandatory arbitration under §13200(a) being compelled to arbitrate because they voluntarily agreed to do so.

Third, Defendants' apparent interpretation of the arbitration provision – that Ohio National only agreed to arbitrate if required to arbitrate pursuant to §13200(a) – is prohibited under the ordinary rules of contract interpretation as it renders the arbitration provision meaningless.  "When interpreting a contract, [a court] will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary." Wohl v. Swinney, 2008-Ohio-2334, 888 N.E.2d 1062, ¶ 22 (2008). See also National Ben. Programs, Inc. v. Express Scripts, Inc., 2010 WL 1963431, *7 (S.D.Ohio, 2010); Hanover Ins. Group, Inc. v. Chartis Specialty Inc. Co., 2013 WL 4495659, *2–3 (D.Mass., 2013).  As FINRA members and associated persons, ON Equities and Plaintiffs are already required under §13200 to submit to FINRA arbitration.  See FINRA Code §13200.  Therefore, the parties' intent in formulating the arbitration provision could not be to force parties already required to arbitrate before FINRA to arbitrate before FINRA.

Moreover, the FAA reflects a "liberal federal policy favoring arbitration."  Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985).  Additionally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of

14

arbitration[.]" <u>Id.,</u> at 221.  <u>See also</u> <u>PaineWebber Inc. v. Elahi</u>, 87 F.3d 589, 594 (1st Cir. 1996)

(Federal law determines the scope of the arbitration clause); <u>Grand Wireless, Inc.</u>, 748 F.3d 1, 7

(1st Cir. 2014) ("At a minimum, this policy requires that 'ambiguities as to the scope of the

arbitration clause itself [must be] resolved in favor of arbitration.'") (citations omitted).  Plus, as

this Court stated in <u>Paquette,</u>  "In determining whether the particular dispute falls within a valid

arbitration agreement's scope, 'there is a presumption of arbitrability [:] an order to arbitrate the

particular grievance should not be denied unless it may be said with positive assurance that the

arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"

<u>Paquette</u>, 2014 WL 5313945 at *6 (citations omitted).

Thus, the only meaningful interpretation of the arbitration provision is that *all parties* to

the agreement are required to submit disputes to FINRA arbitration, and that the arbitration will

proceed according to the FINRA Code.

> **iii.     Contrary to Ohio National's Argument, Courts Have Repeatedly Compelled Non-FINRA Members to FINRA Arbitration Based on Pre-Dispute Arbitration Agreements, and FINRA Has Repeatedly Arbitrated Disputes Involving Non-FINRA Members.**

There is simply no merit to Ohio National's argument that FINRA will not arbitrate

disputes involving non-members.[21]  First, this argument should be ignored as it is not the court's

role to speculate as to what FINRA will do if the matter is referred to arbitration.  Second, Ohio

National cites no authority for its position.  Third, there are numerous examples that directly

refute Ohio National's position – i.e. courts direct non-members to arbitrate at FINRA and/or

FINRA Arbitration Panels require non-members to arbitrate and assert jurisdiction over them.

FINRA can and frequently does conduct arbitrations between members and non-members where,

---

[21] <u>See</u> Joint Statement of the Parties, in which Ohio National contends FINRA will not arbitrate with any non-members with sole limited exception of non-member Registered Investment Advisors who have executed post-dispute arbitration agreements.  Joint Statement of the Parties (Doc. 14), 7.

as here, the parties entered a pre-dispute agreement requiring FINRA arbitration; often those arbitrations have been referred by a court.

For example, in Raymond, James & Associates, Inc. and Scott Lewis v. Southwest Corporate Investment Services, NASD conducted an arbitration involving a non-member over the non-member's objections and as ordered by a court.  NASD Case No. 05-00005, 2005 WL 628190, *3 (Mar. 4, 2005).  Similarly, in UBS Financial Services. Inc. v. Fagenson, FINRA Case No. 17-00195, 2017 WL 4785856, *2 (Oct. 19, 2017), the panel held that arbitration between a non-member corporation and its former employee was "mandatory" based on the parties' execution of a pre-dispute agreement containing an arbitration provision.  Similarly, in E*trade Financial Corp. v. Carrasquillo, FINRA Case No. 07-02146, 2009 WL 365357, *2 (Jan. 27, 2009), the panel entered an award in an arbitration involving a non-member after a court directed the parties to proceed to FINRA arbitration in accordance with their pre-dispute agreements. Indeed, noting that "the Code does not require that persons be registered with FINRA to arbitrate before FINRA," FINRA has proceeded with an arbitration involving non-members that was filed "under protest" by the complainant after a court ordered the parties to arbitrate their disputes in FINRA.  See St. Onge v. Financial Mgt., Inc., FINRA Case No. 08-03050, 2009 WL 3554866, *1-3 (Oct. 23, 2009).[22]

Thus, it is clear that FINRA routinely arbitrates disputes such as this one between Members, Non-Members and Associated Persons.

---

[22] See also, e.g., Goldstein v. Piper Jaffray & Co., 08-00527, 2009 WL 5171921, *7 (Dec. 21, 2009) (FINRA arbitration between non-member corporate respondent and associated person); Rom v. Steele, 17-00087, 2017 WL 5869696, *2 (Nov. 24, 2017) (non-member corporation and associated person compelled arbitration against associated person); Morgan Stanley Smith Barney, LLC v. Cook, 10-03359, 2013 WL 1857480, *3 (Apr. 22, 2013) (non-member compelled arbitration against associated person based on pre-dispute arbitration agreement).

**C. OHIO NATIONAL MUST ARBITRATE BENISON'S CLAIMS BEFORE FINRA BECAUSE SHE IS A THIRD PARTY BENEFICIARY TO THE SELLING AGREEMENT.**

Benison may compel arbitration under the agreement as a non-signatory third-party beneficiary because "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through . . . 'third-party beneficiary theories[.]'" See Grand Wireless, Inc., 748 F.3d at 12 (citing Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009)) (state law governs the inquiry as to whether a non-party to an arbitration agreement can assert the protection of the agreement).  "A non-signatory, third-party beneficiary to an arbitration agreement may invoke [an] arbitration agreement." Rose v. Volvo Const. Equipment North America, Inc., 2007 WL 846123, *5–6 (N.D.Ohio, 2007) (citing Comer v. Micor, Inc., 436 F.3d 1098, 1101 (9th Cir. 2006)); See also  Painting Co. v. Weis Builders, Inc., 2009 WL 150674, *4 (S.D.Ohio,2009) (finding a third party beneficiary to an arbitration agreement may compel arbitration under Ohio law).

Commonwealth's representatives, such as Benison, have a right to enforce the contract as intended third-party beneficiaries.  See McCullion v. Ohio Valley Mall Co., 2000 WL 179368, *2 (Ohio Ct. App., 2000) (citing Hill v. Sonitrol of Southwestern Ohio, Inc., 521 N.E.2d 780 (Ohio 1988); Rae v. Air-Speed, Inc., 386 Mass. 187, 195 (1982).  A third party is an intended beneficiary to a contract if the language and context of the contract indicate that: (1) "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties" and (2) either (a) "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or (b) "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  Hill, 521 N.E.2d at 784; Rae, 386 Mass. at 194 (quoting Restatement (Second) of Contracts, § 302 (1981)).

Here, the first element is satisfied as the Selling Agreement shows a clear intent to benefit Commonwealth's Representatives.[23]  The purpose of the Selling Agreement is to have Commonwealth's Representatives sell Ohio National Contracts.  See Comp., Ex. A, 1.  The Selling Agreement states in its introductory paragraphs that, "[Ohio National] and [ON Equities] propose to have Commonwealth's representatives ("Representatives") who are, or will become, duly licensed insurance agents solicit sales of the Contracts..."  Id.  Commonwealth's Representatives become independent contractors and insurance agents of Ohio National.  Id., Ex. A, ¶¶4, 9.  Ohio National is charged to appoint and license the Representatives as insurance agents to sell the Contracts.  Id., Ex. A, ¶4.  The Selling Agreement states, "[Commonwealth] shall assist [Ohio National] and [ON Equities] on the licensing and/or appointment of Representatives under applicable insurance laws to sell the Contracts."  Id.

The second element is likewise met given that the purpose of Ohio National's commission payments to Commonwealth is to compensate the Representatives for Contract sales.  See Comp., Exs. A - B. The Selling Agreement specifically charges Commonwealth with the obligation to distribute the Commission payments it receives from Ohio National to the Representatives who generated them, by declaring "Compensation to [Commonwealth's] Representatives for Contracts solicited by the Representatives and issued by [Ohio National] will be governed by agreement between [Commonwealth] and its Representatives…"  Id., Ex. A, ¶9.  Moreover, the Commission Schedules give each Representative the option to control how commissions are paid.  Id., Ex. A, ¶9; B.

Thus, it is clear that Ms. Benison is a third party beneficiary of the Selling Agreement and, therefore, can compel arbitration.

---

[23] Representatives or Associated persons are included in 3 out of the 4 pages to the Selling Agreement: in the introductory paragraphs, as well as in paragraphs 4, 5, 7, 9, 12, 16, 17, 23. See Comp., Ex. A.

**D.  THE CASE SHOULD BE STAYED EVEN IF ALL PARTIES ARE NOT COMPELLED TO FINRA ARBITRATION.**

If this Court were to find that some subset of the parties or claims are not subject to arbitration, those claims should be stayed pending completion of the arbitration to preclude the risk of inconsistent results between judge and arbitrator.  The District Court has the inherent power to stay proceedings where the parties are concurrently in arbitration and the claims involve the same operative facts, are inherently inseparable, and the two proceedings would be duplicative of each other.  See, e.g. Christian Mut. Life Ins. Co. v. Monarch Life Ins. Co., 2001 WL 92154, *1 (D.Mass., 2001).  "Even without explicit statutory authority to do so, a court, in its sound discretion, may stay any case pending before it as an exercise of its inherent power to control its own docket."  Bowlby v. Carter Mfg. Corp., 138 F.Supp.2d 182, 188 (D.Mass., 2001) (citation omitted).

Such authority is well established within the First Circuit.  Id. (citing McCarthy v. Azure, 22 F.3d 351, 361 n. 15 (1st Cir. 1994); Sevinor v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 807 F.2d 16, 20 (1st Cir. 1986).  Where factual and legal underpinnings of a Plaintiff's claims in arbitration against one party are substantially similar to those alleged in federal court against another party, courts in Massachusetts will stay the federal action pending the outcome of arbitration.  Baggesen v. Am. Skandia Life Assurance Corp., 235 F. Supp. 2d 30, 33 (D. Mass., 2002).   Where claims in both federal court and arbitration arise out of the performance of an agreement, and the dispute between the parties involves questions of fact, a party is entitled to have a motion for a stay granted by the district court.  Warren Bros. Co. v. Cardi Corp., 471 F.2d 1304, 1309 (1st Cir. 1973); Bowlby, 138 F. Supp. 2d at 188–89 (finding the issues concerning an agreement between parties in arbitration and federal court to be intertwined, requiring a stay).

Here, all parties to this action are each charged under the Selling Agreement with certain

rights and duties.  See Comp., ¶¶163-216, Exs. A-C.  The issues before the Court and the arbitrator concern Ohio Nationals' refusal to pay trail commissions under the Selling Agreement.  Id.  Thus, all of the claims and parties to this action and before the arbitrator are substantially similar and intertwined, requiring this Court to stay the action.

In deciding whether to stay an action, courts in the First Circuit consider "the potential preclusive, evidentiary or issue-narrowing effect of arbitration, as well as considerations of expediency and conservation of judicial economy in deciding the propriety of a stay."  Sevinor, 807 F.2d at 20.  Where it is conceivable that an arbitrator "might" reach and address issues underlying claims in federal court, "[e]xercise of this Court's discretion to stay the instant suit is appropriate for two reasons.  First, concern for judicial economy supports resolving this dispute in a single forum.  Second, the potential for preclusive effect in this federal proceeding of a decision by the arbitrator in the Antecedent Arbitration counsels against splitting issues … among two forums."  Bowlby, 138 F. Supp. 2d at 188–89.

There is a strong likelihood that an arbitrator will resolve the dispute among the parties. A determination by an arbitrator concerning the requirement of any Ohio National entity to pay commissions under the Selling Agreement would resolve questions of fact in the present action and lead to resolution on several issues.  At the very least, the findings of an arbitrator will narrow the issues before the court and provide for judicial economy.  Thus, this court should stay this action pending arbitration.

## V.    CONCLUSION

For the reasons stated above, this Court should grant Plaintiffs' Motion, stay proceedings, and issue an order to arbitrate this dispute in FINRA in the form of the Proposed Order submitted by Plaintiffs.

Respectfully submitted,

COMMONWEALTH EQUITY SERVICES, LLC
d/b/a COMMONWEALTH FINANCIAL
NETWORK and MARGARET BENISON,
By their attorneys,

/s/ Jason E. Tauches
Steven L. Manchel (BBO #551066)
Michael G. Donovan (BBO #564257)
Jason E. Tauches (BBO #569448)
MANCHEL & BRENNAN, P.C.
100 River Ridge Drive, Suite 308
Norwood, MA  02062
(617) 796-8920
(617) 796-8921 (fax)
smanchel@manchelbrennan.com
mdonovan@manchelbrennan.com
jtauches@manchelbrennan.com

Dated:  January 4, 2019

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants on the date specified below.

Dated: January 4, 2019                         /s/ Jason E. Tauches