UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETS

| | |
|---|---|
| Commonwealth Equity Services, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>The Ohio National Life Insurance Company, et al.,<br><br>Defendants, | Civil Action No. 1:18-cv-12314 |

**MEMORANDUM IN OPPOSITION OF DEFENDANTS THE OHIO NATIONAL LIFE
INSURANCE COMPANY, OHIO NATIONAL LIFE ASSURANCE CORPORATION,
AND OHIO NATIONAL EQUITIES, INC. TO PLAINTIFFS' MOTION TO COMPEL
FINRA ARBITRATION AND STAY COURT PROCEEDINGS**

**I.**                                 **INTRODUCTION**

Simply put, neither Defendants The Ohio National Life Insurance Company ("ONLIC")
nor Ohio National Life Assurance Corp. ("ONLAC"), as _non-FINRA members_, are subject to an
enforceable agreement to arbitrate any disputes with Plaintiffs—the threshold issue of
arbitrability that must be resolved _by the Court_.   See Escobar-Noble v. Luxury Hotels Int'l of
P.R., Inc., 680 F.3d 118, 121 (1st Cir. 2012) ("a court should not compel arbitration unless and
until it determines that the parties entered into a validly formed and legally enforceable
agreement covering the underlying claims(s)").  That is true for at least two interrelated reasons.

_First_, the at-issue and _pre-dispute_ arbitration provision contained in the Selling
Agreement between Plaintiff Commonwealth and Defendants provides _only_ for arbitration "in
accordance with the Code of Arbitration Procedure of the NASD, or similar rules or code in
effect on the date of the submission of any such dispute." _Second_, current FINRA (f/k/a NASD)
Rules for industry dispute, unlike the NASD rules in effect at the time the Selling Agreement
was executed, _do not provide for or even contemplate arbitration of industry-related disputes_

*against non-FINRA members like ONLIC and ONLAC*.  As a result, FINRA *lacks jurisdiction* over ONLIC and ONLAC, and no enforceable agreement to arbitrate exists as to those entities.

There is case law on point.  In <u>UBS Bank USA v. Hussein</u>, 2014 U.S. Dist. LEXIS 56106, *9 (D. Utah, April 21, 2014), the court held that UBS Bank, a non-FINRA member affiliate of UBS, could not be compelled to arbitrate before FINRA—even if it was a party to a contractual arbitration provision—because FINRA's rules *do not allow for jurisdiction over such a non-member*.  In so holding, the court noted that "*UBS Bank cannot be compelled to arbitrate Hussein's claim against UBS Bank because the CRA arbitration provision clearly states the rules of the arbitration forum where the claim is filed govern. Hussein filed his arbitration claim with FINRA, and FINRA's rules do not allow jurisdiction over UBS Bank*."  <u>Id.</u> (emphasis added).

Here, the facts supporting a finding of non-arbitrability are equally, if not more, compelling.  The purported, *pre-dispute* arbitration provision executed in 1998 provides for arbitration *solely* in accordance with NASD Rules—rules that have since been changed to *remove* prior language that permitted NASD (now FINRA) to exercise jurisdiction over claims against non-FINRA members.  The current FINRA industry rules make clear, on their face, that such jurisdiction *no longer exists*.  Rather, *only* disputes between FINRA members and/or associated persons (i.e., individual, licensed representatives of FINRA members) may be arbitrated before FINRA.  <u>See</u> FINRA Rule 13200.  Non-members, thus, have no obligation to and cannot be compelled to arbitrate industry disputes before FINRA.

Indeed, even as to disputes under FINRA's *customer* code, which contains broader arbitrability language than the industry code, FINRA has issued *formal guidance* indicating that it will exercise arbitration jurisdiction over non-member Registered Investment Advisers only where, among other things, the *non-FINRA member* RIA executes:  (1) a *post-dispute* arbitration

agreement submitting to FINRA arbitration; and (2) a special, *post-dispute* uniform submission agreement in a form acceptable to FINRA.   See https://www.finra.org/arbitration-and-mediation/investment_advisers (a copy of this guidance is also attached as Exhibit 1).   Hence, even FINRA, itself, has recognized that a pre-dispute agreement—like the one at issue here—is insufficient to require *non-FINRA members* to arbitrate before FINRA, even under the more liberal customer rules.

Therefore, as parties to a *pre-dispute* agreement that specifically provided for *arbitration only in accordance with NASD rules that have since been changed and superseded*, ONLIC and ONLAC have no enforceable obligation to arbitrate Plaintiffs' claims, and they cannot be compelled to do so.   That is critical, given the nature of the claims asserted by Plaintiffs.

At bottom, Plaintiffs seek—under various theories—to recover trail commissions allegedly due on certain individual variable annuity products offered by ONLIC.   Defendants dispute such claims, based on the plain and unambiguous language of the pertinent Selling Agreement.   But, for purposes of the instant Motion, what matters is that:  (1) it is *ONLIC* that sold the variable annuity products at issue; (2) it is *ONLIC* that generated the revenues from which Plaintiffs' claimed commissions were derived; and (3) it is *ONLIC* that—if Plaintiffs' theory was correct—would be required to make the payments at issue. Therefore, the thrust of Plaintiffs' claims is a *non-arbitrable* dispute regarding the alleged contractual payment obligations *of ONLIC*.

To be sure, Defendant Ohio National Equities, Inc. ("ONEQ"), a FINRA member, was a party to the Selling Agreement—a regulatory necessity due to the variable nature of some of the products at issue.   But, there is no real "dispute" as to ONEQ's obligations.   If any trail commissions are owed, then it is *ONLIC* that owes them and will be required to pay them.

Thus, even if the Court was to find that an actual "dispute" exists between Plaintiffs and ONEQ that is subject to FINRA arbitration, the Court should not stay this action as requested by Plaintiffs. Instead, it should sever any arbitrable "claims" against ONEQ and allow the non-arbitrable claims against ONLIC and ONLAC to proceed before this Court in the normal course. Any other conclusion would result in the proverbial tail wagging the dog. See, e.g., Klay v. Pacificare Health Sys., Inc., 389 F.3d 1191, 1204 (11th Cir. 2004) ("[c]ourts generally refuse to stay proceedings of nonarbitrable claims when it is feasible to proceed with the litigation").

In sum, Plaintiffs have no right (contractual or otherwise) to compel ONLIC or ONLAC to arbitrate any claims before FINRA, and there is no actual dispute for which arbitration is necessary, as between Plaintiffs and ONEQ. As a result, Plaintiffs' instant Motion should be denied. Alternatively, even if the Court finds that Plaintiffs' "claims" against ONEQ are arbitrable, it should sever those claims for arbitration and proceed to consider the non-arbitrable claims against ONLIC and ONLAC, which make up the heart of this case.

## II.        <u>STATEMENT OF PERTINENT FACTS</u>

### A.    <u>Overview Of The Parties And The Commonwealth Selling Agreement.</u>

By way of background, ONLIC and ONLAC are insurance companies that, among other things, offer for sale various insurance-related products, including life insurance. [Exh. 2, Declaration of Thomas DeGaetano.] Previously, ONLIC also offered and sold variable annuities. [Id. ¶ 6.] Variable annuities are annuities that include assets maintained in securities sub-accounts. [Id.] Neither ONLIC nor ONLAC are "members" or "associated persons" as defined in FINRA rules. [Id. ¶ 5; see also FINRA Rule 0160(b)(10) (defining "member" as an entity "admitted to membership in FINRA"), and FINRA Rule 13100(u) (noting that "persons associated with a member" are limited to "natural persons").]

In order to make their products available to a wide customer base, ONLIC and ONLAC, along with ONEQ, have historically entered into "selling agreements" with third-party broker-dealers unaffiliated with Defendants—including Commonwealth. [DeGaetano Dec. ¶ 7.]  Such agreements authorized the contracting broker-dealers to offer and sell various products created by ONLIC and ONLAC, including individual variable annuities. [Id.]

At issue in this case is a specific Selling Agreement executed in 1998 by Commonwealth and Defendants.  [Exh. 2-A (the "Selling Agreement"), with Bates numbers added.]   By its express terms and through various incorporated addenda and schedules thereto, the Selling Agreement authorized Commonwealth to sell various products, such as ONLIC's ONcore individual variable annuities, including annuities with an optional Guaranteed Income Benefit Rider (the "GMIB Annuities").  [DeGaetano Dec.; Selling Agreement, at 11-12; Compl. ¶¶ 1-4.] In exchange, Commonwealth was to be paid specified commissions (including trail commissions), so long as, in pertinent part, the Selling Agreement remained "_in force_."  [Selling Agreement, ONcore Commission Schedule, at 12 (emphasis added).]

ONEQ—a broker-dealer registered with FINRA—was made a party to the Selling Agreement for regulatory reasons.   [DeGaetano Dec. ¶ 9.]   That is because the Selling Agreement authorized the sale of variable products, which are regulated as securities.  [Id.] However, the individual variable annuities (including GMIB annuities) were sold _by ONLIC_. [Id.] The premiums paid for purchase of such annuities went _to ONLIC_. [Id.]  And, commissions owed to broker-dealers based on individual variable annuities, pursuant to the terms of the Selling Agreements, were paid _by ONLIC_.  [Id.][1]

---

[1]       Plaintiffs point to language in an ONcore variable annuity prospectus that references the payment of a portion of ONLIC's revenues to ONEQ, and that a portion of those funds are then passed on to the broker-dealers. [Plaintiffs' Memo In Support, at 4, n. 12.]  However, such pass-through language merely reinforces the fact that it is _ONLIC_ that actually sells the subject annuities, and it is _ONLIC's_ revenues that ultimately form the basis of funds

Indeed, as to certain broker-dealers including Commonwealth, commissions pertaining to individual variable annuities sold under the Selling Agreement were paid by ONLIC directly to the Depository Trust & Clearing Corporation ("DTCC"), which then passed on the funds paid by ONLIC to Commonwealth. [Exh. 3, Declaration of Lori Dashewich.]   In other words, DTCC simply acts as an intermediary for payments directly from ONLIC to broker-dealers, like Commonwealth.  [Id. ¶ 5.]  This is shown by the attached ONLIC accounting-related documents, which reflect wire transfers from an ONLIC account to the DTCC.  [Id. ¶ 6; Exh. 3-A.]  DTCC then passes on the same funds to the broker-dealer—in this case, Commonwealth.  [Dashewich Dec. ¶ 6.]

It is Plaintiffs' claimed ongoing entitlement to these types of commissions, paid by _ONLIC_, which forms the basis for all of their claims in this case.

### B.      The Limited Arbitration Provision In The Selling Agreement.

As part of an addendum to the Selling Agreement executed in 1998, the parties included the following "Arbitration" provision, which for ease of reference, we quote in its entirety:

> All parties to this agreement submit and agree that all disputes between the parties of whatever nature or subject matter relating to the duties, obligations, representations, and warranties undertaken by this Agreement, and relating to this Agreement itself, whether existing on the date hereof or arising hereafter, shall be submitted _to arbitration in accordance with the Code of Arbitration Procedure of the NASD_, or similar rules in effect on the date of the submission of any such dispute.  Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction.

> [Selling Agreement, Addendum, at 5 (emphasis added).]

---

paid to broker-dealers.  Moreover, despite the language in the referenced prospectus, that is not how the process actually works—at least with respect to Commonwealth.  [See Dashewich Dec.]

On its face, this provision provides for arbitration of disputes _solely_ in accordance with NASD (now n/k/a FINRA) Rules.  No provision was made for arbitration in any other forum or under any other set of rules.[2]

## III.                 LAW AND ARGUMENT

### A.      The Existence Of An Enforceable Agreement Between The Parties To The Dispute Is A Threshold Question That Must Be Resolved By The Court.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., governs arbitration disputes involving interstate commerce. Although the public policy embodied in the FAA favors arbitration in resolving disputes about the scope of an express agreement to arbitrate, above all:

> [A]rbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.
>
> > [AT&T Tech. Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986).]

It is further clear that "whether or not a company is bound to arbitrate ... is a matter to be determined _by the Court_." Litton Fin. Printing Div. v. Nat'l Labor Relations Bd., 501 U.S. 190, 208 (1991) (emphasis added). See also AT&T Tech., 475 U.S. at 649 (determining whether a contract creates a duty to arbitrate a particular matter is an issue for the court to decide); Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 41 (1st Cir. 2012) ("'[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide.' Parties may delegate questions of arbitrability to the arbitrator, but '[u]nless the parties

---

[2]    Citing correspondence sent by Defendants' counsel as part of the meet and confer process under this Court's local rules, Plaintiffs suggest that Defendants previously took the position that arbitration of all claims in this case was appropriate.  [Memorandum in Support, at 2.]  That is incorrect. To be sure, Defendants inquired whether Plaintiffs intended to dismiss all of their substantive claims in this case, apart from their prayer for injunctive relief.  They did so because Plaintiffs took the position that all claims were arbitrable, yet they included numerous _substantive_ claims for relief in their complaint.  Thus, it was Plaintiffs who took inconsistent positions that, in some circumstances, could lead to a waiver of any claimed right to arbitrate.  See, e.g., Lomas v. Travelers Prop. Cas. Corp., 376 F.3d 23, 26 (1st Cir. 2004) (describing factors for considering whether a party has waived right to compel arbitration).  Defendants' letter, thus, was simply designed to address _Plaintiffs' own inconsistency_ and in no way constituted an admission by Defendants that any of Plaintiffs' claims were, in fact, arbitrable before FINRA.

clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'") (citations omitted).[3]

Courts must, therefore, take care to ensure that they do not force a party to arbitrate a dispute that it has not agreed to arbitrate. Indeed, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). As the Supreme Court recognized in Volt Info. Sciences, Inc. v. Stanford Univ., 489 U.S. 468, 469 (1989), "[a]rbitration under the act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit ... [and] they may limit by contract the issues which they will arbitrate."[4]

Only _if_ the existence of a valid and enforceable agreement is established must a court then determine whether the particular dispute falls within the scope of that agreement. See Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) ("A party who is seeking to compel arbitration must demonstrate 'that a _valid agreement_ to arbitrate exists … and that the claim asserted comes within the clause's scope.'") (emphasis added); Murray v. United Food and Commercial Workers International Union, 289 F.3d 297, 302 (4th Cir. 2002) (court's arbitrability analysis requires it to "ensure ... that a _valid_ agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement"); California Trucking Association v. Brotherhood of Teamsters, 679 F.2d

---

[3]      See also John Hancock Life Insurance Co. v. Wilson, 254 F.3d 48, 55 (2d Cir. 2001) ("we are bound ... to preserve [the broker-dealer's] right to ask a court to make that determination [regarding arbitrability]").

[4]      Accord: First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) ("Arbitration is simply a matter of contract between the parties; it is a way to resolve disputes — but only those disputes — the parties have agreed to submit to arbitration."); Escobar-Noble v. Luxury Hotels Int'l of P.R., Inc., 680 F.3d 118, 121 (1st Cir. 2012) ("a court should not compel arbitration unless and until it determines that the parties entered into a validly formed and legally enforceable agreement covering the underlying claims(s)"); Zandford v. Prudential-Bache Securities, Inc., 112 F.3d 723, 727 (4th Cir. 1997) ("Arbitration may only be judicially compelled when the parties have agreed to it, and then only for those kinds of disputes that the parties have agreed to submit to arbitration.").

1275, 1280 (9th Cir. 1982), cert. Denied 459 U.S. 970 (1982) ("the existence and scope of a contract to arbitrate are questions for the court to determine in the first instance").

      **B.**      **The Existence Of A Valid And Enforceable Agreement To Arbitrate—As Opposed To The Scope Thereof—Is Not Subject To Any Type Of "Presumption" Favoring Arbitrability.**

      Courts—and Plaintiffs here—often cite the general federal policy favoring arbitration, indeed a presumption, in determining whether a particular dispute falls "within the scope" of an express agreement to arbitrate. But let us be clear: This liberal federal policy simply has no bearing on a court's consideration of the threshold question of contract _existence_. To the contrary, the federal policy favoring arbitration is applied "only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was _validly formed and ... is legally enforceable_ and best construed to encompass the dispute." Granite Rock Co. v. Int'l Brotherhood. of Teamsters, 561 U.S. 287, 303 (2010) (emphasis added); see also Comer v. Micor, Inc., 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (the federal policy favoring arbitration "is best understood as concerning 'the scope of arbitrable issues.'").

      It is only _after_ the existence of a valid arbitration agreement is established that a court will apply the federal policy in favor of arbitration. See McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994) (holding that the "imperative" that the validity of an agreement to arbitrate be established first "is in no way inconsistent with the acknowledged 'federal policy favoring arbitration.' The federal policy presumes proof of a preexisting agreement to arbitrate disputes arising between the protagonists.").

      Thus, when the question presented is "not whether a particular issue is arbitrable, but whether a particular party is bound by the arbitration agreement ..., the liberal federal policy regarding the scope of arbitrable issues is inapposite." Comer, 436 F.3d at 1104 n.4 (emphasis

added).  In other words, the "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead ordinary contract principles determine who is bound." <u>Fleetwood Enterprises, Inc. v. Gaskamp</u>, 280 F.3d 1069, 1073 (5th Cir. 2002) (quoted in <u>Comer</u>, 436 F.3d at 1104, n.11).[5]

> **C.     Where There Is A Dispute As To The Existence Of An Enforceable Arbitration Agreement, A Motion To Compel Arbitration Should Be Treated Like A Motion For Summary Judgment And A Trial Held On Disputed Issues Of Material Fact.**

Consistent with the above-described principles, federal courts around the country have uniformly applied the Civil Rule 56 summary judgment standard when reviewing a motion to compel arbitration—particularly as to issues of contract existence. <u>See</u> <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d 171, 175 (2nd Cir. 2003) ("In the context of motions to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (2000), the court applies a standard similar to that applicable for a motion for summary judgment."); <u>Tinder v. Pinkerton Sec.</u>, 305 F.3d 728, 735 (7th Cir. 2002) (noting that courts have analogized the evidentiary standard a party seeking to avoid compelled arbitration must meet "to that required of a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure").[6]

---

[5]     <u>See</u> <u>also</u> <u>California Fina Group, Inc. v. Herrin</u>, 379 F.3d 311, 316 n.6 (5th Cir. 2004); <u>Carson v. Giant Food, Inc.</u>, 175 F.3d 325, 329 (4th Cir. 1999) ("The general policy-based, federal presumption in favor of arbitration ... is not applied as a rule of contract interpretation ... ."); <u>Dumais v. American Golf Corp.</u>, 299 F.3d 1216, 1220 (10th Cir. 2002) ("The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement.").

[6]     <u>See</u> <u>also</u> <u>Cogent Computer Sys. v. TurboChef Techs., Inc.</u>, 2007 U.S. Dist. LEXIS 103215, *12 (D.R.I. Apr. 26, 2007) ("The court concurs that the summary judgment standard is applicable to the Motion [to compel arbitration]"); <u>Salvadori v. Option One Mortgage Corp.</u>, 420 F.Supp.2d 349, 353 (D.N.J. 2006) ("Motions to compel arbitration are reviewed under the summary judgment standard set forth in Fed. R. Civ. P. 56(c)."); <u>Boulet v. Bangor Sec. Inc.</u>, 324 F. Supp. 2d 120 (D. Me. 2004) ("Although the First Circuit has not addressed the question, other courts have held that motions to compel arbitration are subject to the same standard of review as motions for summary judgment.").

That means Defendants, as the parties opposing arbitration on the grounds that no valid agreement to arbitrate exists, are entitled to have the "entire record [viewed] in the light most hospitable to the party opposing [the motion], indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). To the extent an issue of fact exists as to contract existence, or the Court believes a "gray" area exists, Plaintiffs' Motion to Compel must be summarily denied and a trial held to determine the fundamental existence of an agreement to arbitrate between the specific parties in this case. See 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the *trial* thereof.") (emphasis added).

### D.   There Is No Valid Agreement To Arbitrate Between Plaintiffs And ONLIC And ONLAC.

Applied here, these rules establish, in the first instance, that no valid agreement to arbitrate before FINRA exists as to ONLIC and ONLAC. That is true for multiple reasons.

### 1.   ONLIC and ONLAC Are Not Required To Arbitrate Under FINRA Rules.

Initially, it is undisputed that ONLIC and ONLAC are neither FINRA members nor associated persons of a FINRA member. Hence, they cannot be compelled to arbitrate under the language of FINRA's industry code of arbitration procedure. In pertinent part, such code provides for arbitration only as to the following:

> [I]f the dispute arises out of the business activities of a [1] member or an associated person *and* [2] is between or among: [a] Members; [b] Members and Associated Persons or [c] Associated Persons.
>
> [FINRA Rule 13200(a) (brackets and emphasis added).]

On its face, Rule 13200 provides only for arbitration of disputes between, on the one hand, a member or associated person and, *on the other hand*, members and/or associated persons.

Neither ONLIC nor ONLAC fall within the latter category.  Thus, Rule 13200 plainly provides no basis for compelling ONLIC and ONLAC to arbitrate Plaintiffs' claims against them before FINRA.[7]

> **2.      Because It Provides For Arbitration Solely In Accordance With FINRA Rules, The Cited Addendum To The Selling Agreement, Likewise, Imposes No Valid Or Enforceable Obligation To Arbitrate On ONLIC And ONLAC.**

Hence, Plaintiffs are left to argue that they are entitled to compel ONLIC and ONLAC to arbitrate based on the language of the above-quoted, *pre-dispute* Addendum to the Selling Agreement.[8]  But, that argument is equally unavailing given that the pertinent provision in the Addendum provides for arbitration *only* "in accordance with [FINRA] rules" in effect at the time of the submission of the dispute.  As noted above, the current FINRA industry code in place at the time the instant dispute was "submitted" does not provide for, and thus FINRA lacks jurisdiction over, industry claims against non-members and/or associated persons.  Therefore, the

---

[7]      Plaintiffs dedicate nearly five pages of their Motion to arguing that ONLIC and ONLAC cannot invoke the "Insurance Activities" exception set forth in FINRA Rule 13200(b).  [Memorandum in Support, at 6-10.]  However, that is a red herring.  ONLIC and ONLAC have not invoked and do not rely upon such exception in opposing arbitration.  Rather, ONLIC and ONLAC—as non-FINRA members—are not required to arbitrate before FINRA based on the plain and unambiguous language of the Selling Agreement and FINRA Rule 13200(a).

[8]      Plaintiff Benison argues that she is entitled to enforce the terms of the Selling Agreement as a purported third-party beneficiary thereof.  The Court need not reach that issue because, irrespective of Benison's status, ONLIC and ONLAC cannot be compelled to arbitrate the claims asserted by either Benison or Commonwealth under the terms of the Selling Agreement and pertinent FINRA Rules.

Nonetheless, for the avoidance of doubt, Benison is not a third-party beneficiary of the Selling Agreement.  Under Ohio law (applicable under the terms of the Selling Agreement), for a third party to be an intended, as opposed to incidental, beneficiary under a contract, "there must be evidence that the contract was intended to *directly benefit that third party*."  Huff v. FirstEnergy Corp., 130 Ohio St. 3d 196, 200 (2011) (emphasis added).  Stated otherwise, Ohio "courts have noted that for a person to claim intended third party beneficiary status, the contracting parties must have entered into the contract *for the primary purpose of that person*."  Daley v. Fryer, 30 N.E.3d 213, 221 (Ohio Ct. App. 3rd Dist. 2015) (emphasis added).  In virtually every case, courts look for that evidence of such intention or purpose *within the four corners of the contract*: "*[T]he parties' intention to benefit a third party will be found in the language of the agreement*."  Huff, 130 Ohio St. 3d at 200 (emphasis added).

Here, far from expressing an intent to directly benefit Benison, the pertinent language of the Selling Agreement reflects just the opposite.  It states that the compensation to individual representatives like Benison was to be the subject of *separate agreements between the representatives and their broker-dealers*—here, Commonwealth.  [See Selling Agreement § 9.]

purported arbitration provision Plaintiffs invoke is not a valid or enforceable agreement by ONLIC or ONLAC to arbitrate any claims before FINRA.

UBS Bank, *supra*, is on point.  There, a FINRA customer claimant sought to force a non-FINRA member affiliate of UBS Financial Services, a broker-dealer, to arbitrate before FINRA under the terms of a *pre-dispute* Client Relationship Agreement ("CRA").  UBS Bank, 2014 U.S. Dist. LEXIS, at *1-4.   The contract provision at issue indicated that FINRA was the sole forum in which arbitration could be conducted and further noted that the parties were giving up the right to sue "except as provided by the rules of the arbitration forum in which a claim is filed." Id. at *3-4.

Assuming that UBS Bank was subject to the pertinent agreement, the court cited the language referring to application of the rules of the arbitration forum and held that such entity could not be compelled to participate in FINRA arbitration, absent *post-dispute* consent to do so, based on the FINRA customer code—which (as described below) imposes *less-restrictive* requirements for arbitrability than the industry code. It so held because:

> [E]ven if UBS Bank were a party to the CRA, UBS Bank would still not be obligated to arbitrate Hussein's claims before FINRA. …  Hussein chose FINRA as the forum governing his arbitration claim *and FINRA's rules do not allow it to arbitrate claims against UBS Bank without UBS Bank's consent*.
>
> *           *           *
>
> … UBS Bank cannot be compelled to arbitrate Hussein's claims against UBS Bank because the CRA arbitration provision *clearly states that the rules of the arbitration forum where the claim is filed govern.  Hussein filed his arbitration claim with FINRA, and FINRA's rules do not allow jurisdiction over UBS Bank*.
>
> *           *           *
>
> … Even if UBS Bank were a party to the CRA, UBS Bank cannot be compelled to arbitrate Hussein's claims because the FINRA forum where Hussein filed his claims does not have jurisdiction over UBS Bank, and UBS Bank did not consent to FINRA's jurisdiction. …
>
> [Id. at *8-9 (emphasis added).]

13

The same reasoning applies here.  The provision invoked by Plaintiffs as the basis for forcing ONLIC and ONLAC to arbitrate before FINRA provides only for arbitration "in accordance with" FINRA rules.  FINRA rules do not even contemplate arbitration by non-members in industry disputes.  As a result, the plain language of the cited, pre-dispute contractual provision—in expressly incorporating FINRA rules—imposes no obligation on ONLIC or ONLAC to arbitrate Plaintiffs' claims before FINRA.

        **3.**        **A Comparison Of The Pertinent NASD Rule In Effect At The Time The Selling Agreement Was Executed With _Current_ FINRA Rule 13200(a) Emphasizes The _Current_ Lack Of FINRA Jurisdiction Over Non-Members Like ONLIC And ONLAC.**

The result attained in <u>UBS Bank</u>, and which should attain here, is confirmed by a review of historical changes in the pertinent NASD/FINRA Rules, and by a comparison of the current FINRA Industry Rule with the analogous provisions applicable to customer disputes. _First_, that FINRA _currently_ lacks jurisdiction over non-FINRA members in industry disputes is emphasized by a comparison of current Rule 13200(a) with former NASD Rule 10201(a), which was in effect at the time of execution of the Selling Agreement.

Former NASD Rule 10201(a), _unlike current FINRA Rule 13200(a)_, provided for arbitration by "certain others." The former rule was, thus, not limited to disputes solely between and among members and/or associated persons.  The following comparison highlights the key differences in the pertinent rule between then and now (with emphasis added):

| **Former NASD Rule 10201(a)** | **FINRA Rule 13200(a) Currently In Effect** |
|---|---|
| 10201.  Required Submission<br><br>(a) Except as provided in paragraph (b) or Rule 10216 [both of which relate to statutory discrimination claims], a dispute, claim, or controversy eligible for submission under the Rule 10100 Series between or among members and/or associated persons, ***and/or certain others***, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of: (1) a member against another member; (2) a member against a person associated with a member or a person associated with a member against a member; and (3) a person associated with a member against a person associated with a member. | 13200.  Required Arbitration<br><br>(a)  Generally<br><br>Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute ***arises out of the business activities of a member*** or an associated person and is ***between or among***:<br><br>• *Members;*<br><br>• *Members and Associated Persons; or*<br><br>• *Associated Persons.* |

Simply put, arbitration by "certain others" is no longer contemplated by the industry code.  Rather, _only_ disputes between and among FINRA members and associated persons are subject to arbitration before FINRA.[9]

_Second_, a comparison of current Rule 13200(a) with FINRA's current customer arbitration code reveals a key difference that further emphasizes FINRA's lack of jurisdiction over non-members in industry disputes.  Specifically, current FINRA Rule 12201 provides for "Elective Arbitration" in _customer_ disputes.  It states that:

Parties may arbitrate a dispute under the Code if:

• The parties _agree in writing_ to submit the dispute to arbitration under the Code **_after the dispute arises_**; and

[9]     This change in the language of the pertinent rules between 1998 and the present belies Plaintiffs' argument that a decision holding that ONLIC and ONLAC are not contractually obligated to arbitrate would render certain language in the Selling Agreement "meaningless."  [Memorandum in Support, 14.]  To the contrary, such a holding would _correctly_ acknowledge and be _consistent with_ the substantial changes in NASD/FINRA rules effectuated since the Selling Agreement and Addendum were first executed.

• The dispute is between a customer and a member, associated person of a member, ***or other related party***; and

• The dispute arises in connection with the business activities of a member or an associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

[Emphasis added.]

*No similar provision for "elective arbitration" and no reference to arbitration of disputes involving a "related party" are found in FINRA's industry code*.  The absence of such language is glaring, and it was clearly intentional.[10]   FINRA's industry code does not contemplate arbitration by any parties other than FINRA members and/or associated persons.

### 4.   Plaintiffs' Effort To Portray This As A Mere Procedural Issue Fails.

To be clear, as to ONLIC and ONLAC, this issue presents a basic question of arbitrability (specifically, contract existence) as to which no presumption in favor of arbitration applies and which *must be decided by the Court*. Plaintiffs attempt to confuse the issue of whether these entities *are bound by an enforceable agreement to arbitrate before FINRA* by misleadingly analogizing the instant *arbitrability* dispute to cases where courts addressed mere "gateway" procedural issues under FINRA rules that were deemed *not to present questions of arbitrability*. No such "gateway" procedural dispute is presented here, and thus, the decisions cited by Plaintiffs are inapposite.

For example, in Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-85 (2002), the Supreme Court held that determinations regarding application of FINRA's six-year claim eligibility rule presented "gateway" questions to be resolved by arbitrators.  In so holding,

---

[10]     Of course, even though voluntary submission to FINRA's jurisdiction is permissible in the *customer* context, such a submission is only effective where the parties execute a *post-dispute agreement to arbitrate*, as the court recognized in UBS Bank.  Indeed, as noted above, FINRA has provided formal guidance stating that it will exercise arbitration jurisdiction over non-party SEC Registered Investment Advisers, in *customer* disputes, *only* where the RIA executes a *post-dispute* agreement to arbitrate and Submission Agreement.  [See Exh. 1.]

however, that Court specifically noted that application of the six-year rule did not present "a question of arbitrability[,]"—a type of question that, even in the NASD/FINRA context, includes disputes "about whether the parties are bound by a given arbitration clause … [and] whether an arbitration clause in a concededly binding contract applies to a particular type of controversy …." Id.   Such questions of arbitrability, as the Howsam Court recognized, are "*for the court*." Id. (emphasis added).[11]

In the same vein is O.N. Equity Sales Co. v. FINRA Dispute Resolution, Inc., 2008 U.S. Dist. LEXIS 11288, *13-14 (S.D. Ohio, Feb, 1, 2008), also cited by Plaintiffs. There, applying Howsam, the court determined that the question of whether a particular person was a "customer" of a broker-dealer for purposes of NASD rules was akin to a gateway procedural issue to be resolved by the arbitrators, and *not a question of arbitrability*.   Notably, even as to that reasoning, the ONESCO decision has been the subject of subsequent criticism.  See Scottsdale Capital Advisors Corp. v. Jones, 2012 U.S. Dist. LEXIS 67535, *17 (D. Ariz., May 15, 2012) ("The *O.N. Equity* court's conclusion that whether a claimant is a 'customer' under FINRA's rules is a procedural issue for the arbitration panel is unsupported and conflicts with several cases from district courts within the Ninth Circuit that conclude the issue of whether a claimant is a customer within FINRA's rules is a judicial one[.]").

Equally inapposite is Paquette v. McDermott Investment Services, LLC, 2014 U.S. Dist. LEXIS 148166 (D. Mass. 2014).  There, the court was presented with an arbitration provision that *expressly contemplated the submission of questions regarding FINRA's jurisdiction to FINRA*, and provided for an alternative arbitration forum in the event FINRA declined jurisdiction.  Id. at *3.  Hence, the Paquette court's decision to defer to FINRA on the question of

---

[11]   FSC Sec. Corp. v. Freel, 14 F.3d 1310, 1312-13 (8th Cir.), likewise involved application of FINRA's six-year claim eligibility rule and did not address actual questions of arbitrability as subsequently defined by the Court in Howsam.

arbitrability was consistent with the express language of the agreement at issue—language that bears no resemblance to the provision Plaintiffs seek to invoke here.

Against this backdrop, Plaintiffs' citation of FINRA arbitration awards involving non-FINRA member parties is a red herring.  As <u>Howsam</u> makes clear, it is the <u>*Court's*</u> role to determine arbitrability. And, it must make that determination based on an analysis and consideration of the specific language and circumstances at issue in this case.

> **E.**     **There Is No Real "Dispute" Involving ONEQ As To Which Arbitration Is Needed, But In Any Event, The Non-Arbitrable Claims Against ONLIC And <u>ONLAC Should Not Be Stayed.</u>**

Because the alleged payment obligation at issue in this case (if one existed) ultimately falls on ONLIC, there is no real "dispute"—as contemplated in both FINRA Rule 13200 and the Selling Agreement—between Plaintiffs and ONEQ for which arbitration of any sort is needed. However, even if the Court determines that Plaintiffs' claims against ONEQ are subject to FINRA arbitration, it should <u>*refuse to stay*</u> the remaining (and primary) non-arbitrable claims against ONLIC and ONLAC.

It is axiomatic that a party seeking to enforce an arbitration clause as to certain claims is not "entitled as of right to an order staying litigation of all – or even most of – [its] [non-arbitrable] claims …." <u>McCarthy v. Azure</u>, 22 F.3d 351, 361 & n.15 (1st Cir. 1994). To the contrary, "[c]ourts generally refuse to stay proceedings of nonarbitrable claims when it is feasible to proceed with the litigation." <u>Klay v. Pacificare Health Sys., Inc.</u>, 389 F.3d 1191, 1204 (11th Cir. 2004).  Such a refusal is consistent with the "preeminent concern of Congress" in enacting the Federal Arbitration Act, which is to "enforce private agreements into which parties had entered … <u>*even if the result is piecemeal litigation*</u> … ."  <u>Dean Witter Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 221 (1985) (emphasis added).

Thus, the "heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course." Dean Witter, 470 U.S. at 225 (White, J., concurring).  This "heavy presumption" is especially weighty where either the nonarbitrable claims are not dependent on the outcome of the arbitrator's decision or *the arbitrable claims do not predominate*.  See, e.g. United Communs. Hub, Inc. v. Qwest Communs., Inc., 46 Fed. Appx. 412, 415 (9th Cir. 2002) ("Expanding the stay, so as to encompass all of the nonarbitrable claims in the case, is [only] appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision").  Thus, courts across the country have routinely rejected motions to stay litigation involving both arbitrable and non-arbitrable claims.[12]

Here, the stay requested by Plaintiffs would be particularly inappropriate given that the principal alleged obligor based on the claims asserted—*ONLIC*—is not subject to arbitration before FINRA.  Thus, even if some claims are arbitrable, the non-arbitrable claims predominate in this case.  As a result, the interests of judicial efficiency and the prompt resolution of justiciable disputes would be *disserved* by Plaintiffs' requested stay.  A contrary conclusion would result in the proverbial tail wagging the dog.

**IV.**              **CONCLUSION**

For all of these reasons, Plaintiffs' motion to compel arbitration lacks merit.  It should be denied.  Alternatively, even if the Court finds that Plaintiffs' "claims" against ONEQ are

---

[12]       See Chang v. Lin, 824 F.2d 219, 222-23 (2nd Cir. 1987) (holding that the district court erred in staying the litigation of nonarbitrable federal claim pending arbitration of related claims, in doing so noting that "courts have recognized the merit in generally allowing arbitration and federal litigation to proceed simultaneously," and "it is well established that a district court may order arbitration and refuse to stay nonarbitrable proceedings"); Girard v. Drexel Burnham Lambert, Inc., 805 F.2d 607, 614 (5th Cir. 1986) (affirming district court order denying motion to stay litigation pending arbitration, as there was no authority that "suggests that the litigation of nonarbitrable issues must be stayed pending the arbitration of pendent state claims"); Sam Reisfeld & Son Import Co. v. S. A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976) (affirming district court's denial of motion to stay litigation where the arbitrators were not required "to resolve any important legal or factual issues relating to the [non-arbitrable] antitrust claims").

arbitrable, it should sever those claims for arbitration before FINRA; but deny Plaintiffs' request to stay the remaining non-arbitrable claims asserted against ONLIC and ONLAC.

Respectfully submitted,

/s/ Robert R. Berluti
Robert R. Berluti (BBO #039960)
David L. Hansen (BBO #670621)
Michael A. Bednarz (BBO #689047)
Berluti McLaughlin & Kutchin LLP
44 School Street, 9th Floor
Boston, Massachusetts 02108
Tel: (617) 557-3030
Fax: (617) 557-2939
rberluti@bmklegal.com
dhansen@bmklegal.com
mbednarz@bmklegal.com

Christopher J. Hogan, Esq. (Ohio# 0079829)
(admitted Pro Hac Vice)
Marion H. Little, Jr., Esq.
(admitted Pro Hac Vice)
Zeiger, Tigges & Little, LLP
41 S. High Street, Suite 3500
Columbus, Ohio 43215
Tel: (614) 365-9900
Fax: (614) 365-7900
hogan@litohio.com
little@litohio.com

Attorneys for Defendants
The Ohio National Life Insurance Company,
Ohio National Life Assurance Corporation
and Ohio National Equities, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of January, 2019, I electronically filed the foregoing using the CM/ECF system, which constitutes services upon counsel of record.

/s/ Robert R. Berluti
Robert R. Berluti (BBO #039960)

414-033:  793939